No. 86,740

STATE OF KANSAS *Appellee*, v. ROMANE R. DOUGLAS, *Appellant*.

(49 P.3d 446)

Opinion filed July 12, 2002.

*Janine Cox,* assistant appellate defender, argued the cause, and *Steven R. Zinn,* deputy appellate defender, was with her on the brief for appellant.

*Lesley A. Isherwood,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Following a mistrial where the jury was unable to agree on a verdict, Romane Douglas was convicted in his second trial by a jury of two counts of premeditated first-degree murder, K.S.A. 21-3401(a), and two counts of aggravated robbery, K.S.A. 21-3427. He was sentenced to two consecutive hard 50 sentences.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (a conviction of an off-grid crime).

The issues arise from Douglas' assertions on appeal that he is entitled to a new trial based on numerous errors below. We frame the questions for review as whether: (1) the State used a peremptory strike for a discriminatory purpose, thus violating *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); (2) the district court erred in refusing to instruct the jury on second-degree intentional murder and voluntary manslaughter as lesser included offenses of first-degree premeditated murder; (3) the prosecutor engaged in misconduct during closing arguments requiring reversal; (4) prior crimes evidence was improperly introduced by the State; (5) there was sufficient evidence to support Douglas' convictions for premeditated first-degree murder; (6) the Kansas hard 50 sentencing scheme is unconstitutional under *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct.

2348 (2000); and (7) the district court abused its discretion in finding that the aggravating factors submitted in support of the two hard 50 sentences outweighed the mitigating factors.

Finding no error, we affirm.

## FACTS

Because Douglas questions the sufficiency of the evidence supporting his convictions for premeditated murder, we expand the recitation of the facts.

In 1999, police searched Jesse Mejia's house in Garden City in connection with warrants for cocaine and marijuana trafficking. Cash and jewelry were seized in the search. Mejia hired an attorney to represent him. In a settlement around October 1, Mejia received $10,000 and his jewelry, valued at $2,000. On September 29 and October 1, Mejia and Alfredo Martinez checked into rooms at the Knights Inn Motel in Wichita. Telephone records showed that on October 3, at 6:58 p.m., a call was made from Mejia's motel room to Douglas' cell phone number. There also had been three other calls from Mejia's room to Douglas' cell phone number that day.

On October 3, Mejia visited his former sister-in-law Terri Mejia around 7:20 p.m. Terri had been married to Mejia's brother Rito, who was in custody at the El Dorado Correctional Facility. Rito was scheduled to call at 7:30 p.m., and Mejia wanted to talk to him. Mejia told Terri that he was going to Barry Sanders Park (a football field inside of McAdams Park) and would be back in about 20 minutes. Mejia apparently never returned.

That evening, at 9:17 p.m., the police found one Hispanic man lying on his stomach in the street with his arms above his head. He was bleeding from his left ear and left shoulder area and was not breathing. Shell casings were observed at the foot of the victim. A rawhide glove was found nearby. A second Hispanic man was lying on his back, perpendicular to the curb. He was experiencing labored breathing. He had been shot in the back of the head. His left pants pocket was pulled out, exposing the white lining. An investigator testified that it appeared from a mark that a bullet had struck the curb near the body. Blood was also found near the strike

mark. The victims, identified as Jesse Mejia and Alex Martinez, died from gunshot wounds.

Martinez' maroon Camry was located near McAdams Park, about 2 blocks north and 2 blocks west of the area where the bodies were found. Officers found blood in various places inside the car, including the left rear seat. An investigator testified that he did not believe the blood stain would have been on the left rear seat of the Camry if someone was sitting in that seat. Bullet fragments were found in the front dash of the car. Additional blood samples were taken from the Camry's exterior right rear quarter panel. Three Winchester 9 mm cartridge cases and traces of gravel were discovered on the right rear floorboard.

The police found two black leather jackets in McAdams Park. Blood was on both jackets. One jacket had a bullet hole in the right shoulder. Forensic testing revealed that Mejia's DNA profile was consistent with the sample on one jacket, and Martinez' DNA profile was consistent with the sample on the other jacket. A brown jacket was also found in Douglas' car, a Suburban. Blood samples found on the brown jacket were consistent with Martinez' and Mejia's DNA profiles.

On October 5, 1999, Officer Richard Vickers was dispatched to a Wichita domestic disturbance call. Upon arrival, Vickers arrested Douglas for outstanding traffic offenses. Douglas requested permission to release some personal property to his mother. Vickers allowed him to do so. Douglas handed his mother a roll of money, which he said was a "couple hundred dollars," and some jewelry.

When homicide investigator Detective Kelly Otis attempted to locate Douglas for questioning regarding the outgoing phone calls from the Knights Inn, he discovered that Douglas had been arrested. After being *Mirandized*, Douglas agreed to speak with Detective Otis. When first asked if he knew any Hispanic men, Douglas replied that he did not. Later in the interview, he recalled meeting a Hispanic man out on the street 3 or 4 days before his police interview. When asked about his activities on the weekend, Douglas initially told Otis that he had gotten drunk and did not remember what he had done. Later, Douglas said he had been at the house of a lady he knew as "Fire" for about 3 hours and then

he drove around with a guy he knew as "Sweets." According to Douglas, he and Sweets later went to the house of another friend, LaTonya Jennings. Douglas thought he had left Jennings' house around 4:30 a.m. to go to his mother's house, where he lived, to check on his son. Then, he returned to Jennings' house.

Douglas eventually told Detective Otis that he remembered a call on his cell phone on Sunday (October 3) from a Hispanic man he called "S.A." Douglas said he had seen S.A. the day before when they were stopped at an intersection. S.A. had asked Douglas if he could get some marijuana. Douglas told Detective Otis that he led S.A. to an area where he knew a guy that sold marijuana. Douglas thought he might have given his own phone number to S.A.

Douglas told the detective that S.A. called him the next day, wanting to buy a pound of "weed." He initially said he gave S.A. the phone number of the dealer from the day before. Douglas' caller ID showed that S.A. was calling from the Knights Inn. Douglas identified a photograph of Mejia as the man he referred to as "S.A." He was not able to identify Martinez.

Douglas initially denied having been in McAdams Park on Sunday. Later in the interview, he said that he had met some Hispanic men at the park. He told Otis that S.A. had called him and said Douglas needed to be at the drug deal. According to Douglas, he drove his vehicle to McAdams Park and sat for awhile. Then, S.A. and another man arrived in a car. The dealer also arrived. Douglas said he attempted to leave after the three others met, but his car was out of gas. He told Detective Otis that he walked to the closest convenience store, got gas in a gas can, and took it back to his car. Then, he drove away. According to Douglas, the other men were gone when he returned to the park. Otis asked Douglas if someone could verify his story, and Douglas replied that a man that he knew as "Lez" or "Layez" was with him.

Small amounts of blood were found on Douglas' shoes. Fluid tested from his right shoe was consistent with Martinez' and Douglas' DNA profiles. Blood tested from Douglas' left shoe was consistent with Martinez' DNA profile. When Detective Otis mentioned the blood, Douglas said there was no way that blood was on his shoes.

A gun was never located. In Mejia's motel room, police found about $600 in a sock. There was no accounting for the other $5,400 that had been given to Mejia ($4,000 of the $10,000 had been paid to Mejia's attorney). One of the police sergeants reported that the money Douglas gave his mother totaled about $200. The jewelry Douglas gave her was not the jewelry that had been returned to Mejia. Mejia's jewelry was never found.

### Defendant's trial testimony

Douglas testified at trial. He said he went to a party with some friends at the Knights Inn on the night of October 2, 1999. There, he met Mejia, who he knew as S.A., and Martinez. Martinez asked for some marijuana. Douglas told him that he knew someone who had some, and Douglas and Martinez exchanged phone numbers. Douglas said he would contact L.A., a man he had met in a liquor store 2 or 3 months before. Douglas knew L.A. sold marijuana because he had purchased marijuana from him two to four times. Douglas called Mejia and Martinez the afternoon following the party to ask them if they still wanted the marijuana. He also called L.A. Mejia and Martinez were to meet L.A. at McAdams Park at 8:30 p.m. to purchase one pound of marijuana. Later, Mejia and Martinez called Douglas to ask him to be at the park.

Douglas arrived at the park alone. While waiting, he parked his car and kept it running, but it ran out of gas. When Mejia and Martinez arrived, Douglas asked Mejia if they had a gas can. They did not. Douglas got into the back seat of their car, the Camry, and waited behind the driver's seat until L.A. arrived. L.A. got into the car with the other three men. L.A. expressed concern that there were other people in the park, so Mejia drove around until L.A. directed him to pull over.

L.A. gave Martinez a plastic bag of marijuana. Douglas received a call on his cell phone. While he was on the phone, he heard the other three men start to argue. L.A. said something about the others being "informers." Douglas hung up his phone. L.A. pulled his gun, shot Martinez, and then shot Mejia. Douglas quickly got out of the car and ran to some nearby apartments. He stayed there about 15 to 25 minutes before walking to the gas station. At the

gas station, he saw a friend named Angela, who drove him back to his car.

. Douglas said he first gave the police different information in the interview because he was scared that if he told police he witnessed the crime, he would be accused of it. He also was scared of L.A.

## DISCUSSION

First, we take up the *Batson* issue. Douglas contends that the State impermissibly used a peremptory challenge to remove the only African-American from the jury panel. He asserts that (1) the defense made a prima facie case of racial discrimination and (2) the State's reason for removal was not racially neutral. Douglas' counsel objected to the peremptory strike under *Batson*. The State gave its explanation for striking the juror. The district court accepted the State's reason as racially neutral. In the alternative, the district court found that Douglas did not make a prima facie showing of purposeful discrimination.

Resolution of a *Batson* challenge to a peremptory strike by the State has presented a frequent appellate issue for this court. Whether a prima facie showing of a racially-based strike has been made is a question of law subject to plenary review. *State v. Sledd,* 250 Kan. 15, 21, 825 P.2d 114, *cert. denied* 506 U.S. 849 (1992). However, the district court's decision about whether the State acted with discriminatory purpose is subject to an abuse of discretion standard of review. *State v. Vargas,* 260 Kan. 791, 794, 926 P.2d 223 (1996). We review the district court's findings with deference. *State v. Conley,* 270 Kan. 18, 25, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001).

Here, the district court initially expressed doubt that Douglas presented a prima facie showing of racial discrimination. Nevertheless, the court heard the State's reasons for striking the African-American from the jury panel and found that the State gave a race-neutral reason for the strike. We have held that when the district court rules on the ultimate question of discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot. *State v. Campbell,* 268 Kan. 529, 534, 997 P.2d

726, *cert. denied* 531 U.S. 832 (2000). Because the district court considered the *Batson* issue, we will also do so.

The prosecutor explained that the juror was struck because he had a relative that lived in a nursing home in the crime scene area. During voir dire, the juror said that he traveled through the area once every 2 weeks to visit a family member in a nursing home. The State noted that it removed another juror because she said she lived near the area. In addition, the defense struck a Hispanic juror who said he lived near the area.

Douglas was black, and the victims were Hispanic. However, it appears that the State's reason for striking the African-American did not relate to characteristics of any particular race. Other jurors that were familiar with the area were also struck. We find no abuse of discretion in the district court's finding that the State's justification for use of its peremptory challenge was racially neutral. See generally *Vargas*, 260 Kan. 791.

## Jury Instructions

Douglas contends that the district court erred in failing to instruct the jury on second-degree murder and voluntary manslaughter as lesser included offenses of premeditated murder. Because Douglas requested the instructions, we are required to view the evidence in the light most favorable to him. He is entitled to an instruction on the law applicable to his theories for which there is supporting evidence. *State v. Hayes*, 270 Kan. 535, 541, 17 P.3d 317 (2001).

The district court found that the evidence did not support the lesser included offense instructions. We have said there is "[n]o duty to instruct the jury on a lesser included offense . . . where the evidence as a whole, viewed in the light most favorable to the defendant, could not reasonably support a jury verdict on the lesser included offense." *State v. Simkins*, 269 Kan. 84, 90, 3 P.3d 1274 (2000). A review of the facts here supports the district court's ruling.

At the jury instructions conference, Douglas' counsel emphasized the voluntary manslaughter instruction. Counsel said:

"Specifically there was testimony under oath, this is defense's case in chief, this perpetrator, . . . L.A., had a sudden quarrel with those individuals, Mr. Mejia. Mr. Martinez. And . . . that after this or during this quarrel that, the gun shots were fired. Of course, State's theory is Mr. Douglas is the shooter, and I understand that and I recognize, and the jury could find, infer from all the evidence this was a sudden quarrel—that the circumstances were a sudden quarrel happened, that would be voluntary manslaughter; therefore, that instruction should be given."

Noting that Douglas was charged with alternative counts of premeditated murder and felony murder, the district court (1) discussed whether lesser included offense instructions were necessary given the charge of first-degree premeditated murder; (2) noted that the State's theory was that Douglas acted alone in killing the victims (Douglas' theory was that L.A. killed the victims); (3) observed that if the jury believed Douglas' testimony, it would find him guilty of felony murder or not guilty; and (4) found that Douglas' testimony precluded second-degree murder or any form of manslaughter.

The jury was given the following aiding and abetting instruction.

"A person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime.

"*This instruction relates to the allegations that the defendant aided another in committing or attempting to commit either aggravated robbery or sale of marijuana.*" (Emphasis added.)

Douglas asserts that by giving an aiding and abetting instruction, the district court was required to give all instructions for his benefit that would have been afforded to the principal, referring to L.A., including second-degree murder and involuntary manslaughter.

Douglas fails to acknowledge that the aiding and abetting instruction did not apply to first-degree premeditated murder. We find no support for Douglas' argument that by giving the aiding and abetting instruction, the district court was also required to instruct the jury regarding second-degree murder or voluntary manslaughter.

Douglas also contends that he presented evidence from which a rational juror could conclude that intentional, but not premeditated, murder occurred or that voluntary manslaughter based upon a sudden quarrel could have occurred. Intentional second-degree murder is the killing of a human being committed intentionally. K.S.A. 2001 Supp. 21-3402. Douglas does not point to any evidence that would support a conviction for intentional second-degree murder. Douglas' defense theory was that shortly before the shooting, there was some sort of brief argument between L.A. and the victims. Douglas does not contend that he was involved in the argument. The evidence showed that Douglas was engaged in a drug deal with the victims. He met the victims at McAdams Park and got into the back seat of their car. After driving to another location, the victims were shot in the head and left in the street. The evidence suggested that bullets were again fired at the victims in the street. The evidence overwhelmingly points to premeditation. The evidence as a whole, viewed in the light most favorable to Douglas, could not reasonably support a jury verdict on the lesser included offense of intentional second-degree murder. See *Simkins*, 269 Kan. at 90.

Douglas also argues that the district court should have given the voluntary manslaughter instruction under his theory of a sudden quarrel. Voluntary manslaughter is the intentional killing of a human being committed in the heat of passion or upon a sudden quarrel. K.S.A. 21-3403(a). However, his theory of defense never included being involved in a "quarrel" with the victims. The only evidence presented regarding a quarrel involved the victims and L.A. *Hayes*, 270 Kan. at 542 (noting that the "quarrel" was between the victim and another person, not the defendant). Thus, the evidence could not reasonably support a jury verdict on the lesser included offense of voluntary manslaughter.

### Prosecutorial Misconduct

Douglas next contends that the prosecutor committed misconduct during closing arguments, warranting reversal. We disagree.

Douglas did not object to most of the prosecutor's closing comments. The analysis of the effect of a prosecutor's alleged improper

remarks in closing argument is a two-step process. First, we must decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, we must decide whether the remarks constitute plain error, that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. *State v. Parker*, 273 Kan. 56, Syl. ¶ 6, 41 P.3d 789 (2002).

First, Douglas takes issue with the prosecutor's following comment:

*"Mr. Douglas was not aiding and abetting anyone.* Mr. Douglas committed these murders by himself. And the evidence clearly establishes that." (Emphasis added.)

Douglas made no objection. He argues on appeal that "[t]he prosecutor clearly wanted the jury to believe that the defendant had requested the aiding and abetting instruction, which he knew was incorrect." As the State points out, the defense theory was that Douglas was in the Camry when Mejia and Martinez were shot, but that Douglas was not the shooter. The State reasons that the remarks were nothing more than a restatement of the State's theory that Douglas acted alone in the murders. We agree.

Second, Douglas questions the following remarks to which he did not object:

"[I]*f you believe every word that came out of Mr. Douglas' mouth, then you're pretty naive, because what he said doesn't make any sense.* . . . Mr. Douglas not only *at best, he made up the name L.A., he came up with it, tried to pitch it to you folks, tried to do as best he could with you.*

". . . So, without me spending any more time on his story, *which is quite frankly unbelievable,* believe it if you want and find him guilty of felony murder during the course of a sale of marijuana because he set it up. If you believe him, he got the parties together, he participated in that if you believe him. *It's the State's position that you should not believe anything he says.*" (Emphasis added.)

Later, the prosecutor said, "One, [Douglas'] story is ridiculous and absurd and ludicrous." Douglas' counsel objected to that type of remark. The district judge sustained the objection, saying: "I'm ruling that you can categorize the defendant's evidence without the use of those words. I will sustain the objection. The jury should disregard." Then, without objection, the prosecutor said:

"Defendant's story is unbelievable. It is absolutely, totally and completely unbelievable. Now, once we move past that, and so I don't offend anybody I will move past that."

Towards the end of closing arguments, the prosecutor said:

"[I]t is up to you to decide the weight and credit to give any particular witness or any piece of testimony, so you can judge what Mr. Douglas has decided to tell you and judge it for what it is worth. *And I will call it what it is. It's unbelievable. It is unbelievable.* That's what doesn't make any sense.

. . . .

". . . *I submit to you that you shouldn't believe a word out of his mouth.* And the reason you shouldn't believe a word out of his mouth, and believe me folks, if you think that this is the first defendant that got up and said, I didn't do — ." (Emphasis added.)

Douglas' counsel objected on the basis that the prosecutor was talking about other cases that were not in evidence. The prosecutor then said, "Let me rephrase it so there is not a problem. Just because somebody says they didn't do it, doesn't mean they didn't do it. That again is common sense. That is every day experiences with children or whatever else you have." Defense counsel again objected, and the court overruled the objection.

Douglas relies solely on *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000), to support his contention that the prosecutor's remarks prejudiced him and denied him a fair trial. In *Pabst*, we said: "When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury." 268 Kan. at 507. There were numerous continued and pointed references to Pabst as a liar. We found prejudicial error. See 268 Kan. at 511.

Douglas suggests that the prosecutor's comments on the believability of his testimony were akin to the prosecutor's conduct in *Pabst*. He also contends that the prosecutor improperly interjected his own opinion when he said, "It's the State's position that you should not believe anything [Douglas] says."

Here, it appears the prosecutor was attempting to show that Douglas' version of the events was not practicable under the evidence presented at trial. At the end of closing arguments, the pros-

ecutor said, "And, again, I would argue to you that this is not me telling you this. It's the evidence telling you this." The prosecutor's characterization of Douglas' version of the facts as "unbelievable" did not rise to the level of the conduct in *Pabst*.

Further, when the prosecutor said Douglas' "story is ridiculous and absurd and ludicrous," the district court instructed the jury to disregard the statement. While such a comment appears improper, it did not deprive Douglas of a fair trial. We have said: " ' "Improper remarks made by the prosecuting attorney in [the] summation to the jury will not provide a basis for reversal where the jury has been instructed to disregard the same, unless the remarks were so prejudicial as to be incurable." ' " *State v. Zamora*, 247 Kan. 684, 689-90, 803 P.2d 568 (1990) (quoting *State v. Perales*, 220 Kan. 777, 780, 556 P.2d 172 [1976]). Compare *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461 (1997) (ill will was found when prosecutor disregarded prior sustained objection and continued to refer to defendant and counsel as liars).

Finally, Douglas argues that the prosecutor impermissibly vouched for a State's witness in the following statement, to which there was no objection:

*"And you can judge by seeing Detective Otis and the type of work he does whether he told somebody or not, and I submit to you that Detective Otis didn't lie to anybody.* And absent that, doesn't really matter, because the blood convicts Romane Douglas." (Emphasis added.)

The prosecutor's statement that "Detective Otis didn't lie to anybody," when placed in context, is unclear in its meaning. Near the end of closing arguments the prosecutor said, "In fact [the detective] can lie to a defendant, a suspect, and it is perfectly acceptable. . . . Detective Otis could lie to all of us in an interview, but he didn't [about blood found on Douglas' personal items]." In context, it appears the prosecutor was focusing on the importance of the blood evidence.

Under the facts here, the prosecutor's comments neither prejudiced the jury against Douglas nor denied him a fair trial.

### Prior Crimes Evidence

Douglas contends that the district court erred by allowing the

State to introduce prior crimes evidence in violation of a pretrial motion in limine. We disagree.

While it is true that an order in limine excludes evidence that, if admitted, would tend to prejudice the jury, it is not true that a violation of the order always results in prejudice that cannot be cured. We employ a two-part test to evaluate alleged violations of a motion in limine: (1) Was there a violation of the order in limine and (2) if the order in limine is violated, did the testimony substantially prejudice the defendant? The burden is on the defendant to show substantial prejudice. *State v. Galloway*, 268 Kan. 682, 692-93, 1 P.3d 844 (2000).

Before the first trial, Douglas filed a motion in limine to prevent the introduction of prior convictions or bad acts. At the hearing on the motion, the district judge said:

"[T]he defendant's criminal history is generally inadmissible, subject to a 60-455 motion, which we have none in this case. Really the only other basis would be *if the defendant would take the stand and somehow open the door*. So in general, the defendant's prior criminal conduct, whatever it is, his prior criminal history is inadmissible in this case." (Emphasis added.)

During opening statements, defense counsel told the jury that Douglas had met a drug dealer known to him as "L.A." and that Douglas would call L.A. to get marijuana. Defense counsel also told the jury, "Douglas did some things in the past that he probably should not have done  . . . . [W]hen he got the marijuana, at times would sell it to other individuals." Clearly, Douglas first introduced prior crimes evidence to the jury. During direct examination, Douglas testified that he had met L.A. in a liquor store and that L.A. had asked if Douglas knew anyone trying to get some "weed." Douglas told L.A. that he smoked weed and that if L.A. would give him his phone number, Douglas could get in touch with him when he needed some. When defense counsel asked Douglas if he had occasions to get marijuana from L.A., Douglas said, "Yes." Douglas testified that over the course of 2 or 3 months, he got marijuana from L.A. two to four times. Douglas also testified that Martinez approached him at the party at Knights Inn and was looking for weed. According to Douglas, he told Martinez that he knew a source that could get him as much as a pound or more.

On appeal, Douglas complains that the State elicited prior crimes evidence during his cross-examination. On cross-examination, the prosecutor noted that L.A., and later the victims, asked Douglas "about getting marijuana." Then the prosecutor inquired, "How many times has this happened to you before?"

Douglas' counsel objected. A discussion followed out of the presence of the jury. Douglas' counsel clarified that his objection was based on the previously filed motion in limine. The prosecutor argued that it was Douglas who had testified about people approaching him for marijuana and that some latitude was warranted on cross-examination. The district court overruled the objection. It noted that Douglas had testified that L.A., who Douglas had never met before, approached Douglas and asked him if he wanted to buy marijuana and that Douglas had also testified that Mejia and Martinez, who Douglas had never met before, approached him and asked about marijuana. The district court found that "other people approaching" Douglas was "not even a bad act on the part of the defendant." The district court also found that in light of Douglas' defense, the question was not prejudicial. We agree.

Back in the presence of the jury, the prosecutor continued Douglas' cross-examination without objection. Later in the cross-examination, the prosecutor asked if Douglas had ever brokered a drug deal before, like he had for Mejia and Martinez. Douglas replied that he had years ago. When asked if that was done with L.A., Douglas said, "No" and that he had not known L.A. then. Again, the defense made no objection.

The prosecutor's inquiry on brokering "other deals" presents a close question on whether a violation of the motion in limine occurred. However, Douglas fails to show how he was prejudiced, given his direct testimony regarding his involvement in drug-related activity. His own version of events put him in the middle of a drug deal. In addition, we note that there was no contemporaneous objection to the question relating to other drug transactions. See *State v. Johnson*, 266 Kan. 322, 334, 970 P.2d 990 (1998).

## Sufficiency of the Evidence

Douglas argues that there was insufficient evidence to support

his convictions for first-degree premeditated murder. Again, we disagree. Our standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found Douglas guilty beyond a reasonable doubt. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999).

The record shows that Douglas scheduled a drug transaction with the victims. He met them in McAdams Park on the night of the murders. He got into the backseat of the victims' car. At some point the car was driven to a secluded area where Mejia and Martinez were shot. The victims were later found in the street. Evidence suggested that the shooter fired additional shots at the victims. Blood was found on the backseat on the driver's side of the victims' car. Spent cartridges and gravel were found on the floorboard behind the passenger's seat. The parking area at McAdams Park contained granular-looking soil. Forensic evidence showed that a shoe the size and style of Douglas' left shoe could have made a footprint found in the parking area. The record shows that when police searched their database for anyone with the nickname "L.A.," they found one person, and that person was incarcerated at the time of Mejia's and Martinez' murders.

A review of all the evidence, viewed in the light most favorable to the State, convinces us that a rational factfinder could have found Douglas guilty of premeditated first-degree murder beyond a reasonable doubt.

## The Sentence

Douglas argues that the Kansas hard 50 sentencing scheme, K.S.A. 2001 Supp. 21-4638, is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), the United States Constitution, and the Kansas Constitution Bill of Rights. This contention is controlled by *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001).

In *Conley*, we held that the Kansas hard 40 sentencing statute violates neither the Sixth Amendment right to jury trial, the Fourteenth Amendment Due Process Clause of the United States Con-

stitution, nor § 5 of the Kansas Constitution Bill of Rights. 270 Kan. 18, Syl. ¶ 3.

### Aggravating and Mitigating Factors

Finally, Douglas objects to the district court's finding that the aggravating factors were not outweighed by mitigating factors. During sentencing, the district court considered both aggravating and mitigating factors. We will not disturb the district court's findings absent an abuse of discretion. See *State v. Spain*, 269 Kan. 54, 60, 4 P.3d 621 (2000). The district court found two K.S.A. 2001 Supp. 21-4636 aggravating factors: (1) Douglas knowingly or purposely killed more than one person, and (2) he committed the crime for the purpose of receiving money or other thing of monetary value.

Douglas presented four K.S.A. 21-4637 mitigating factors: (1) no significant history of prior criminal activity; (2) he was an accomplice to a crime committed by another person, and his participation was minor; (3) he acted under duress; and (4) he was young.

The district court found:

"As to mitigating factors, after reviewing all the evidence and the entire record that we have in this case, the Court is unable to find the existence of any mitigating circumstances; and even if the Court accepted all the mitigating circumstances offered by the defendant as valid, the Court would still find the aggravating circumstances are not outweighed by the mitigating circumstances."

In reviewing the hearing transcript, it appears that the district court considered the mitigating factors presented and found that even if all the mitigating factors that Douglas presented were valid, the aggravating factors were not outweighed by them. We find no abuse of discretion.

Affirmed.