No. 86,899

STATE OF KANSAS, *Appellee,* v. LISA J. GRAHAM, *Appellant.*

(83 P.3d 143)

Opinion filed January 30, 2004.

*Korey A. Kaul,* assistant appellate defender, argued the cause, and *Shawn Minihan,* assistant appellate defender, was with him on the brief for appellant.

*Ellen H. Mitchell*, county attorney, argued the cause, and *Phill Kline*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Lisa Graham was charged with and tried on two counts of attempted first-degree murder and on one count of aggravated arson. A mistrial was declared after the jury twice informed the trial court it was deadlocked. The trial court acquitted Graham on the aggravated arson charge. Before she was retried, four counts of aggravated assault on a law enforcement officer were added to the charges against her. Graham was convicted by a second jury on all counts. In an unpublished opinion, the Court of Appeals affirmed the convictions of attempted first-degree murder, reversed the convictions of aggravated assault on a law enforcement officer, disapproved a 60-month postrelease supervision term imposed on Graham, and remanded for resentencing. The court granted Graham's petition for review of the Court of Appeals' decision on the issues of prosecutorial misconduct, double jeopardy, and sufficiency of the evidence of attempted first-degree murder.

Graham raises the following issues:

1. Did the prosecutor's comments in closing argument deprive defendant of a fair trial?

2. Did the second trial violate defendant's right not to be subjected to double jeopardy?

3. Was there sufficient evidence to support the convictions of attempted first-degree murder?

In September, Graham was experiencing problems in the office, with her family, and with her love life, and her sales fell off. In the office, a newly-hired salesperson discounted accessories to make sales, which was not acceptable to Graham, and Graham testified that someone put up pictures of monkeys, which she believed to be depicting her. With regard to her personal life and family, her sister was the complaining witness in a prosecution of Graham for kicking down the door of her sister's house in November 1998 to see if Graham's boyfriend was there. The case was tried on September 28, 1999, Graham's attorney withdrew, she was found guilty, and her family supported her sister. Graham was hurt and

angry when the proceeding ended. She was supposed to go to court services to arrange for a presentence investigation. Graham testified:

"I thought [a presentence investigation] was where I'd have to admit guilt and I didn't feel like I was any more guilty than my sister . . . . [W]e went into Court Service's office and I said I wouldn't do it and I left and went and got on the elevator and left screaming . . . . Just before I got on the elevator [the prosecuting attorney] told me that I would be automatically locked up for 60 days."

Graham went straight home and went to sleep.

When she got up early the next morning, September 29, she was thinking about the police coming in her house. She stretched a wire from her refrigerator to the basement door hinge to keep the door from opening completely and to cause it to make a noise if the door were opened. She put some charcoal lighter fluid in a bowl and set it in front of the front door with a candle between the bowl and the door. Graham testified that "if somebody came in they would knock the candle over and ignite the charcoal fluid and they'd see the—the flame go up and stay out." Without lighting the candle, she went back to sleep.

Later in the morning, she awoke to someone knocking on her door. She assumed it was the police, did not answer, and went back to sleep. When she woke up in the afternoon, she called her friend, Georgaleen Thomas, at Cellular One to see if the police had been there looking for her. She was told the police had not been there, but, because she was expecting the police to try to arrest her, she stayed in her house.

Sometime during the morning of September 30, police officers Edward Swanson and Tom Gardner went to Graham's house to serve the warrant that had been issued for her arrest. They knocked repeatedly, but no one answered the door.

Graham had taken a couple of days approved vacation on September 28 and 29, but she was expected back at work at noon on September 30. At approximately 11:30 that morning, she called her supervisor to say that she would not be coming in anymore and that she wanted certain of her accounts transferred to Thomas. After Thomas returned to work from lunch on September 30, she received a call from Graham. Thomas told Graham that the police

were looking for her, and Graham said that she wasn't going to turn herself in. Thomas, who had known Graham for many years, described her as "really calm" during the call. After Graham ended the conversation, Thomas went straight to their supervisor with her fear that Graham was contemplating suicide. Thomas then called the suicide hotline, reported her concern, and gave them Graham's name and place of residence. The person she talked with on the suicide hotline told Thomas that he had to notify the police.

Brandon Tomson was the first police officer to arrive at Graham's house. He had been told by the dispatcher that the occupant of the house was threatening suicide. He knocked on the front door, got no answer, tried the door and found it locked, then walked around the house looking for access. He found none, and the closed blinds kept him from seeing in the windows. He remained on or near the deck at the back of the house.

Officers John Krenowicz and Russ Lamer arrived next. Without getting any response, they continued to try the doors, they had dispatch ring the telephone in the house, and they called Graham's cell phone. Krenowicz located one window on the southeast part of the house that was unlocked and had some screws missing from the storm window. He and Lamer removed the remaining screws and opened the window. There was a strong odor of gasoline. Krenowicz and Lamer crawled in through the window of the unoccupied room and found that the carpet was soaked with liquid. With their weapons drawn and acting as a team, the officers began to check the house for occupants. As they got into the living room, Krenowicz saw Graham standing in the doorway that led down to the basement and made eye contact with her.

Graham brought up her right arm up and lit the lighter she was holding. Underneath her left arm, Graham had what appeared to be Roman candles. She was backing down the basement stairs. Krenowicz yelled at Lamer to get out. As Krenowicz was undoing the locks on the front door, he heard popping sounds and he noticed a bowl and unlit candle on the floor.

Once outside, he yelled at newly arrived Officer Lanning to help him get fire extinguishers out of the patrol units. Krenowicz gave an extinguisher to Lamer, and the two of them stood near the front

door. They could see flaming balls from the Roman candles, and the house started filling with smoke. Lamer tried to douse the flames with his extinguisher. One of the flaming balls hit Lamer in the chest and burned a small hole in his uniform.

The fire department arrived, and a fireman kicked the back door open. Lamer saw Graham through the smoke in the house, he yelled for Graham to come out, then he and Krenowicz reentered the house. Krenowicz drew his gun. Lamer dashed approximately 10 to 12 feet into the house and tackled Graham. Lamer testified that he saw Graham raise her right hand, which appeared to have something in it. A gun fired. At first, Lamer was not sure what made the noise. Lamer picked Graham up and took her out the front door. After she was handcuffed, some handgun shells were found on her. Graham had safety-pinned a note inside her jacket, dated September 30, 1999, that stated:

"To Whom it May Concern:

My funeral arrangement have been made with Roselawn Mortuary, they already have all directions. Frank Zavala . . . will be in charge of everything not Rachel Holt.

If my Kidneys only are not damaged I would like them donated to Wynola Winn, . . . no other parts of my body are to be donated.

Signed,

(signature)

Lisa J. Graham"

Graham testified that she fired the Roman candles trying to set her house on fire. She further testified that, with the house filled with smoke and firemen and police officers on all sides of the house, she dropped the fireworks, and took the gun from her waistband to put it under her chin. According to Graham, the next thing she knew she was on the floor.

After the fire was out, police reentered the house and found a .38 Taurus handgun on the floor. There were five rounds in it; one was a spent shell that was under the firing pin. One spent projectile was removed from the ceiling joists. There was a gasoline can on the steps to the basement. Articles of Graham's clothing and items collected from throughout her house tested positive for gasoline.

A medium petroleum distillate, which charcoal lighter fuel frequently is made from, also was detected on some items.

We first consider whether the prosecutor's comments in closing argument deprived Graham of a fair trial.

A two-step analysis is applied to allegations of prosecutorial misconduct. First, the court decides whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error; that is, whether the statements are so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby requiring reversal. *State v. Scott*, 271 Kan. 103, 113, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001). The facts of each case must be scrutinized in determining whether a prosecutor's remarks deny the defendant a fair trial. See *State v. Rodriguez*, 269 Kan. 633, 641, 8 P.3d 712 (2000).

Graham complained of two specific comments made by the prosecutor during closing argument and several of his comments on her lack of credibility. As to those comments, the Court of Appeals said:

"The prosecutor argued Graham lit the candle by the front door. The testimony fairly clearly established Graham did not light the candle. The prosecutor's comment was improper, but it is highly unlikely a different verdict would have resulted absent the comment.

"The prosecutor also stated Graham made a move towards the fireworks under her arm when she first encountered Officer Krenowicz. The officer's testimony on this point was clearly contradictory, but it was for the jury to determine what to believe. The comment was not reversibly improper.

"Graham also claims the prosecutor injected his personal beliefs into argument and implied Graham was not telling the truth. When a case turns on which of two conflicting stories is true, it may be reasonable to argue that certain testimony is not believable. *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000).

"This case rested on conflicting testimony, and it was within the prosecutor's latitude to comment on those differing pieces of testimony. We are unable to hold the comments denied Graham a fair trial." Slip op. at 2-3.

Officer Krenowicz testified that as he was unlocking the front door in order to get outside, he noticed a bowl and unlit candle on the floor in front of the door. Graham denied lighting the candle. She explained the already burnt wick dated from some romantic

dinner in the past. In closing argument, the prosecuting attorney stated:

"When the police arrived she heard them, she heard them in the front, she heard them in the back, she knew they were around the house, they weren't going to go away. She knew it so she poured the gasoline in the basement. Then she went upstairs and she poured the charcoal lighter fluid in the little bowl behind the door and she put that candle there *and she lit it*. Why did she do that? Because if they tried to come in before her plan was finished that would keep them out. *So she lit that candle at that point.*

MR. CHRISTIANS: Your Honor, I'm going to object; that mischaracterizes the evidence. The candle was not lit.

MR. STANTON: It had been burned, Judge.

THE COURT: Yeah, that's a reasonable argument. Need to be careful on interrupting in closing." (Emphasis added.)

In considering this issue, the Court of Appeals concluded that "[t]he prosecutor's comment was improper, but it is highly unlikely a different verdict would have resulted absent the comment." Slip op. at 2.

The prosecutor's statement contradicted the testimony, not only of the defendant, but also of the State's witness, Krenowicz. The prosecutor's statement was an incorrect statement of the evidence and was clearly improper.

Graham seems to argue that the prosecutor's statement might have affected the verdict by lending support to the State's otherwise incredible theory that the bowl of charcoal lighter fluid and candle were a booby trap for the officers. What the prosecuting attorney actually said about the purpose of the bowl of charcoal lighter fluid and candle was that, if the police officers "tried to come in before her plan was finished that would keep them out." Graham said almost precisely the same thing about the purpose of the bowl of charcoal lighter fluid and candle: "[I]f somebody came in they would knock the candle over and ignite the charcoal fluid and they'd see the—the flame go up and stay out."

Thus, although outside the wide latitude allowed for discussing the evidence in closing argument, the statement that Graham lit the candle, by itself, did not prejudice the jury against her so as to deny her a fair trial.

Krenowicz testified that he saw Graham standing in the doorway to the basement, and she raised her right arm and lit the lighter she was holding in her right hand. Krenowicz testified that he told Graham to drop it, but, instead, she used the lighter to light the fireworks that were underneath her left arm. Then he yelled to alert Lamer and went to the front door to get out of the house. Before the officers got the locked front door open, Krenowicz heard popping sounds, like a Roman candle going off. In cross-examination, Krenowicz admitted that he did not actually see Graham light the Roman candles because he and Lamer were trying to get out the front door. In closing argument, the prosecuting attorney stated:

"Officer Krenowicz had kneeled down in the gasoline and he comes around the corner and he's got a gun, he is ready to protect himself and this woman lights this lighter. Now does he take time? He says drop it one time. She doesn't do it. She instead goes for the candlestick, the Roman candles, the candles. How do you know he thought he was about to be harmed? He did nothing else but run for that door."

The prosecutor's statement is not at odds with the testimony. Although Krenowicz did not actually see Graham light the fireworks, his testimony that she did so was a reasonable inference, based on his hearing the popping sounds of Roman candles before he and Lamer were able to get the front door unlocked, that Graham lit them within a very short time after Krenowicz told her to drop the lighter. We conclude the prosecutor's statement was not improper.

Graham also complains that the prosecutor took several opportunities in closing argument to comment unfavorably on her credibility. This court has repeatedly reminded prosecutors that, while they may argue the facts that a jury should consider in assessing credibility and determining guilt, the Kansas Rules of Professional Conduct (KRPC) unequivocally state that an attorney shall not state a personal opinion about the credibility of a witness or the guilt of the accused. KRPC 3.4(e) (2003 Kan. Ct. R. Annot. 429). "The point of not allowing a prosecutor to comment on the credibility of a witness *is that expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony,* not *com-*

*mentary on the evidence of the case." State v. Pabst,* 268 Kan. 501, 510, 996 P.2d 321 (2000).

In his closing argument, the prosecutor made the following statements about catching Graham in a lie:

"Now something very interesting happened yesterday I would submit to you. The defendant is saying well, I was going to get all my stuff together, I was going to go down and talk to my buddy Frank, 'cause maybe he could talk me out of this or maybe he could give me a solution. Was she searching for solutions other than what she had already planned, ladies and gentlemen? If she was searching for solutions why did she take those Roman candles with her? I asked her. She said, 'I don't know.' Why did you have a gun with you? Oh, I might decide to do it along the way I guess as a paraphrase is what she answered. She going to take a gun down to talk to her buddy or was it more likely that if she became—if she came to a situation she was confronted by police that she was ready to do something about that situation? But you know that she didn't go because as she said as I was going out the back door the police came. Problem, big problem. She testified that she had put that wire across there 30 hours before that, 36 hours before that. She couldn't have gone out the back door. So I asked her you were going out the back door, you couldn't, there's a wire there. Oh, there was enough room for me. *So now I caught her by surprise. She had to come up with that.* Well when did you? Well, how do you know that? Oh, it was only about eight inches, I could squeeze through there. Well did you try? I could squeeze through there. Did you try? Yes. When? Because see we've gone through the scenario on times at least twice and nothing was ever said about her trying that door until I asked that question. *It's hard to make things up on the fly I would submit to you.* What had she testified to, I never left the house. She wouldn't even go to the door to see who was knocking. But now she's saying that she opened that back door and squeezed through there to make sure she could get through." (Emphasis added.)

For the most part, this portion of the prosecutor's closing argument points out inconsistencies within Graham's testimony, which is the prosecutor's job. The two italicized remarks, however, rather than being commentaries on the evidence, are expressions of the prosecuting attorney's opinion that Graham was fabricating her testimony.

Graham testified that she poured gasoline on her vinyl carpet protectors. One ran from the kitchen door to the front door, another ran from the kitchen door to the bathroom door, and a short one ran in front of the front door. She testified that she thought, "[I]f I pour it on the mat, then if I change my mind I can clean

the mats off, throw them out, it's done with." In closing argument, the prosecutor said: "We know that she put gasoline through part of the house because she'll admit to that but only to the extent that well, I could change my mind." On appeal, Graham interprets the prosecutor's remark as stating that she would only admit to pouring gasoline "if she could later change her mind on her testimony." Appellant misinterprets the prosecutor's remark. Both Graham and the prosecutor referred to the possibility of her changing her mind about burning down the house and being able to remove the gasoline from the house by removing the mats. What the prosecutor seemed to be pointing out was the difference between Graham's admission of pouring gasoline on the mats and evidence of gasoline in the southeast bedroom.

As he began to sum up his argument, the prosecuting attorney stated:

"That's what the evidence shows, that's what all this evidence shows. *I submit to you she didn't tell you anything that was true.* She told you the things that she had to tell you because they're undeniable. I submit that what she didn't tell you was anything that she could deny, anything that she could keep from taking responsibility for." (Emphasis added.)

It appears from the context that perhaps what the prosecutor intended to say was that Graham didn't tell the jury *everything*, rather than *anything*, but the appellee's brief contains no mention of this. The State's argument is that much more egregious comments on defendants' credibility have passed this court's muster. The State cites *State v. Finley*, 273 Kan. 237, 42 P.3d 723 (2002), and *State v. Douglas*, 274 Kan. 96, 49 P.3d 446 (2002).

In *Finley*, the prosecutor said that two of the defendant's witnesses, Tom and Denise, " 'testified pretty consistently with each other, but their stories are incredible and they're virtually impossible to believe.' " 273 Kan. at 245. About Tom, she said: " 'He's said various things at various times, and the reason why people do that is because they can't keep all the lies straight.' " 273 Kan. at 246. The court did not view the prosecutor's comments as being improper because they were based "on an inference drawn from the nature of the defendant's conflicting stories, not on the prosecutor's knowledge of the defendant's veracity," and

"[f]urthermore, the phrase 'they can't keep all the lies straight' does not come close to the egregious manner in which the prosecutor in *Pabst* called the defendant a liar. See 268 Kan. at 505-06." 273 Kan. at 246. The court did find error to the extent that the prosecutor expressed her belief as to credibility in the following: " 'And I'm sorry, but I just can't buy this story that Tom and Denise come up with that Tom was somewhat of a hero risking his life to go in and save these people in the house. It seems to me there was no remorse for LaDonna's injuries or her death. Only emotion that we saw from him or Denise came when they were testifying about his own injuries. Doesn't seem like a martyr to me.' " 273 Kan. at 247. With overwhelming evidence of guilt, the court found that the error had little likelihood of changing the trial's outcome. 273 Kan. at 247.

In *Douglas,* the prosecutor, at various times during closing argument, made the following statements:

" '[I]f you believe every word that came out of Mr. Douglas' mouth, then you're pretty naive, because what he said doesn't make any sense. . . .

". . . So, without me spending any more time on his story, which is quite frankly unbelievable . . . . It's the State's position that you should not believe anything he says.'

. . . .

" 'Defendant's story is unbelievable. It is absolutely totally and completely unbelievable. . . .'

. . . .

" ' . . . [I]t is up to you to decide the weight and credit to give any particular witness or any piece of testimony, so you can judge what Mr. Douglas has decided to tell you and judge it for what it is worth. And I will call it what it is. It's unbelievable. It is unbelievable. . . .'

. . . .

" ' . . . I submit to you that you shouldn't believe a word out of his mouth.' " 274 Kan. at 106-07.

The court concluded that the prosecutor's remarks did not rise to the level of the conduct that warranted reversal in *Pabst*. 274 Kan. at 107-08. Nor do the prosecutor's remarks in the present case rise above the level of the conduct that did not warrant reversal in *Douglas*. Although here the prosecutor's comments are outside the wide latitude allowed in discussing the evidence, they were not so

gross and flagrant as to prejudice the jury against the defendant and deny her a fair trial.

We next consider whether the second trial violated Graham's right under the Fifth Amendment to the United States Constitution not to be subjected to double jeopardy?

K.S.A. 22-3423(1)(d) provides that the "trial court may terminate the trial and order a mistrial at any time that he finds termination is necessary because . . . [t]he jury is unable to agree upon a verdict." Declaration of a mistrial is a matter entrusted to the trial court's discretion, and the decision will not be set aside on appeal unless abuse of discretion is clearly shown. *State v. McClanahan*, 259 Kan. 86, 92, 910 P.2d 193 (1996).

In this case, the jury began deliberations at 1 p.m. At 4:50 p.m., with the jury in the courtroom, the following dialogue occurred:

"THE COURT: Members of the jury, have you selected a presiding juror? . . . [Y]ou sent out a note saying no decision. Is that on either count?

"PRESIDING JUROR: Yes.

"THE COURT: I'm—at this point I'm going to ask for a judgment call on your part. And do you feel that the jury has exhausted any possibility of reaching a decision or do you think further deliberations may result in resolving the decision?

"PRESIDING JUROR: I feel it's exhausted but there might be others that might not feel the same.

"THE COURT: I don't want to know—obviously don't want to know what your voting numbers are or anything like that. Does [presiding juror] speak for the jury as a whole?

"THE JURY: Yes.

"THE COURT: So I'm taking it you feel that you have all given it your conscientious effort and that further deliberations would not be fruitful? I know it's been a long day but I'm going to ask you to give it one more shot, okay? We've all—you all have quite obviously a lot of time and effort invested in this and you're giving it your conscientious decision making and that's all we can ask of you but obviously if you read the instructions there you know where we're coming from on that also so let's give it one more shot. We won't keep you here, you know, beyond dinner time. Let's give it one more shot, see if you can come to a common conclusion so that we can determine the case.

"PRESIDING JUROR: Good enough."

At 5:25 p.m., the jury reentered the courtroom. The trial judge addressed the presiding juror, "You've sent a note out advising that the jury in your opinion is at a deadlock." The presiding juror

responded, "Deadlock." The trial judge discharged the jury and declared a mistrial.

As the Court of Appeals noted, the trial court did not consult defendant before discharging the jury and declaring a mistrial. Nor did defense counsel object.

At the State's suggestion, the Court of Appeals required the State to demonstrate a manifest necessity for the trial court's declaring a mistrial without defendant's consent. The Court of Appeals found that a manifest necessity was shown by the jury twice informing the trial court that it was deadlocked.

Although Graham's right under the Double Jeopardy Clause was not violated, it was not for the reason stated by the Court of Appeals. Here, the district court *sua sponte* declared a mistrial, and Graham did not object. In *State v. Wittsell*, 275 Kan. 442, 446, 66 P.3d 831 (2003), this court stated: "The long-established test applied where the first trial was terminated *over objection* of the defendant is the 'manifest necessity' standard. [Citation omitted.] Retrial is constitutionally permissible only where a high degree of necessity supports the mistrial." (Emphasis added.) Since Graham did not object to the granting of a mistrial, the "manifest necessity" standard is not applicable. The correct standard, where the defendant does not object, is the same standard as if Graham had consented to the mistrial. "Where a criminal defendant consents to a mistrial, double jeopardy is not implicated unless the prosecutorial conduct giving rise to the mistrial was intended to 'goad' the defendant to move for a mistrial. Retrial is constitutionally permissible where the governmental conduct was not intended to provoke the defendant into seeking a mistrial." *Wittsell*, 275 Kan. 442, Syl. ¶ 3. Although the trial court's reasoning was improper, it will not be reversed if it is right, albeit for the wrong reason. *State v. Bryant*, 272 Kan. 1204, Syl.¶ 6, 38 P.3d 661 (2002).

In her petition for review, Graham relies on *United States v. Horn*, 583 F.2d 1124 (10th Cir. 1978), for the proposition that the defendant is deprived of her right to have her trial completed by a particular tribunal if the jury is discharged when further deliberations may produce a fair verdict. In *Horn*, after the jury had deliberated approximately 3 hours, it sent out a note saying it was

deadlocked. The trial court excused the jurors for the evening. The next morning, the trial court told the jurors that they had not deliberated long enough to have fully considered the evidence, he reminded them of their duty to reach agreement if possible, and told them to re-examine their views and not hesitate to change their minds. In addition, the trial judge gave a formal *Allen* charge and returned the jury to its deliberations. After slightly more than an hour passed, the trial judge, without hearing from the jury or consulting the parties, had the jury brought into the courtroom and declared a mistrial. 583 F.2d at 1125. Noting that a trial court is justified in declaring a mistrial when a jury is unable to agree upon a verdict, the federal Court of Appeals identified the problem in *Horn* as being that there was no basis for concluding that the jury could not reach agreement because the trial judge did not inquire of the jury whether it was able to agree. 583 F.2d at 1126. In that peculiar circumstance, the trial judge had no basis for declaring a mistrial.

In contrast, in the present case, the trial judge returned the jury to its deliberations after it first advised of its inability to agree. After the jury advised the trial judge a second time that it was deadlocked, he declared a mistrial. This is not a *Horn* situation. Defendant cites no other authority for her position on this issue. We find no merit in Graham's argument.

Finally, was there sufficient evidence to support the convictions of attempted first-degree murder?

Graham argues that the prosecutor's theory that she coaxed police officers into her gasoline-soaked house in order to murder them and end her own life is not supported by the evidence. She contends that the evidence, instead, supports her testimony that she was contemplating suicide and trying to avoid the police. For each bit of evidence that would support her conviction of attempted first-degree murder, Graham suggests a nonincriminating interpretation.

Because the evidence in this case could be interpreted as fitting either the prosecutor's theory or the defendant's, the standard of review decides the matter. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether,

after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003). Viewed in the light most favorable to the State, the evidence supports the jury's verdict.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

BEIER and NUSS, JJ., not participating.

BRAZIL, S.J., and LARSON, S.J., assigned.