IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,690

STATE OF KANSAS,
*Appellee*,

v.

LEE EDWARD WILLIAMS,
*Appellant.*

SYLLABUS BY THE COURT

1.

To determine prosecutorial error, an appellate court decides whether the act complained of falls outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial. If it finds error, the appellate court determines if that error prejudiced the defendant's right to a fair trial.

2.

A prosecutor may make statements in closing arguments about a defendant's trustworthiness to point out inconsistencies in the defendant's statements and to argue evidence that reflects poorly on a defendant's credibility. But it is improper for a prosecutor to offer his or her personal opinion on a defendant's credibility.

3.

A three-step process is used under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to consider racial discrimination claims in the exercising of peremptory challenges during jury selection. First, the party contesting the strike must make a prima facie showing that the other party exercised a peremptory challenge based

on race. Second, if the requisite showing is made, the burden shifts to the party exercising the strike to articulate a race-neutral explanation for striking the prospective juror in question. In this second step, the striking party is required only to put forth a facially valid reason for exercising the strike, but it does not need to be persuasive or plausible. Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination.

4.

The district court's ruling on the *Batson* challenge is reviewed under an abuse of discretion standard.

5.

An appellate court reviews the admission of photographic evidence by first determining whether the challenged photos were relevant. If they are relevant, and a challenging party's objection is based on a claim that the photographs were overly repetitious, gruesome, or inflammatory, i.e., unduly prejudicial, the standard of review is abuse of discretion. The burden of showing an abuse of discretion rests with the party asserting the error.

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed October 26, 2018. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Lois Malin*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.*, district attorney, and *Derek L. Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: This is a direct appeal by Lee E. Williams from his convictions of first-degree premeditated murder and criminal possession of a firearm. He argues reversal is required because of: (1) prosecutorial error during closing arguments by calling his testimony a fabrication; (2) trial court error in overruling his claim of racial discrimination during jury selection; (3) trial court error in admitting overly gruesome autopsy photographs; and (4) cumulative error. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Lee E. Williams and Tysha Carvin knew each other for 20 years. They were in a relationship, lived together, and had a son. The couple broke up in January 2013, when their son was two years old. After the breakup, they lived separately. The boy lived with Tysha, who occasionally stayed at her aunt's house, where Tysha's grandmother also lived.

Williams periodically visited his son. But Tysha did not let Williams see their son as often as Williams wanted after Williams' new girlfriend became pregnant. Frequent altercations arose because of this.

On September 3, 2013, Williams was at the aunt's house most of the day before leaving for the evening and returning after midnight. Williams testified that when he returned, Tysha was the only person awake. She became "upset" about the new girlfriend and the pregnancy. Williams got "upset" because of text messages Tysha received from another man discussing a sexual relationship. Williams tried to leave with his son. According to Williams, Tysha said, "[B]ring me my son here right now or I swear to God I'm going to shoot you." She pointed a gun at Williams, so he brought their son back.

3

Williams testified the gun was his, and that Tysha got it from an area near a fish tank, where he had put it earlier.

Williams said the two fought for the gun and it "started going off." By this time, the aunt and grandmother joined the struggle. Williams said he "didn't have substantial control of the gun. The gun was going off."

The grandmother and the aunt testified differently. The grandmother said she heard Tysha call for help around 2 a.m. and went downstairs. She saw Tysha on the floor between the dining room and front door. Williams was holding Tysha's foot, trying to pull her out the door. The aunt said she woke up because of the noise downstairs and saw the grandmother, Tysha, and Williams at the door.

Both women said they heard Williams say, "I don't want to do it in here." And at some point, Tysha "scoot[ed] back" away from Williams and ended up near the fish tank. The aunt saw Williams pull out a gun and fire multiple times at Tysha. The aunt called the police and Williams left the house.

Police officers arrived. An officer photographed Tysha's body near the fish tank as well as seven shell casings lying around her. Multiple bullet holes were found in the wall just behind her. Tysha was killed by two bullets that matched shell casings found at the scene.

Two days later, Canadian border officials apprehended Williams trying to cross into Canada with a fake ID. The State charged Williams with first-degree premediated murder under K.S.A. 2017 Supp. 21-5402 and criminal possession of a firearm under K.S.A. 2017 Supp. 21-6304. A jury found him guilty of both counts.

4

The district court sentenced Williams to life imprisonment, with a minimum 25-year incarceration before parole eligibility, for the first-degree premeditated murder. It also sentenced him to a consecutive, 20 months' incarceration for criminal possession of a firearm, set to run after the life sentence.

Williams timely appealed. Jurisdiction is proper. K.S.A. 2017 Supp. 22-3601(b)(4) (requiring direct appeal to Supreme Court in "any case in which the crime was committed on or after July 1, 1993, and the defendant has been convicted of an off-grid crime"); K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 2017 Supp. 22-3601).

THE PROSECUTORIAL ERROR CLAIM

Williams complains the prosecutor's closing remarks amounted to calling him a liar and giving an improper personal opinion about his credibility. We disagree.

*Additional facts*

Williams argues the italicized remarks below were improper because they represented the prosecutor's personal opinion about his credibility:

"I want to emphasize . . . it is for you to determine the weight and credit to be given to the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified.

"And I emphasize that one and I start off with that one because in this case you've heard two divergent, contrasting versions. You've heard what [Tysha's aunt] and [Tysha's grandmother] testified to. And then you heard a version that the defendant testified to, and they're worlds apart.

5

"In voir dire one of the things I asked you about was will you be able to listen to the witnesses and then go into the jury room and talk about it and decide which is the version? And this is exactly what we're getting at, is that you're going to have to go in there and say, am I believing [grandmother] and [aunt], or am I believing what the defendant had to say? *I'm going to suggest to you that the defendant made a lot of his story up as he testified on the stand*, or while he was on the stand, and I'm going to get to that in this way.

"We have some givens in this case. Some things that can't be contradicted. Seven shell casings. The gun was fired seven times. We've got two gunshot wounds on Tysha, and you've got pictures that you can take back with you and look, and not only was she shot twice, but it's where she's shot twice. You'll see the rod that goes down somewhere between the eye and the ear, and the angle that it goes down and comes out the mouth and down into the breast.

. . . .

"*Now what I'm going to suggest to you is that what the defendant testified to, and to be honest about that, that was a quite confusing version of facts that he gave when he could say I don't even know how the gun was fired or who fired it*.

"Well it couldn't have been fired by Tysha. She's not going to be able to shoot herself coming from behind in the manner in which the doctor testified. It just can't physically happen, which I suggest to you shows you that *his version is false, his version is fabricated* and that you should, under this instruction, disregard his testimony.

"Another area that gives you cause to disregard his testimony is the 911 call. Listen—go back and play it if you have to. Listen to [aunt]'s voice. The defendant testified that after the shots were fired he just stood there, and that [aunt] said you better leave now, Lee.  Do you think that's what she said when you hear her voice on there? When she's crying and screaming about her niece? That you better leave now, Lee.

6

. . . .

"So you've got the 911 call, the call to the mom, the angles of the wounds are most telling in that, and then finally you've got his flight to Canada. We've got a guy who says this is nothing but an accident, ladies and gentlemen. This is an accident, or if you don't believe it's an accident, then believe it's self-defense. Now those are worlds apart in themselves, accident or self-defense, but after one accidentally shoots somebody, or after one defends themselves under the letter of the law, do they run to Canada?

. . . .

"And the other thing we have to prove is the premeditation. To have thought the matter over beforehand. In other words, formed the desire or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous intentional act of taking another's life.

"He formed the premeditation when he tried to drag her outside. There, and that's before the act, that's before the shooting. And how do we know this for sure? Because he tells [aunt] and he tells [grandmother], I'm going to kill her. Right there—I mean, how much more do you have to give of evidence that one intends to kill, that one's thought it over, than to say what you're going to do? And then he also—a little kind of apologetically says I'm not going to do it in your house, I'm not going to disrespect you, I'll do it outside. Like that makes it better." (Emphases added.)

*The two-step* Sherman *test*

The two-step analysis for reviewing prosecutorial error claims is set forth in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), which declared:

"[The] two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide [1] *whether the*

7

*prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case* and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine [2] *whether the error prejudiced the defendant's due process rights to a fair trial*. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" (Emphases added.) 305 Kan. at 109.

*Analysis*

Kansas caselaw is unwavering that "the word 'lie' or its derivative should be avoided by prosecutors," but not all prosecutorial comments with that connotation are error because under some circumstances they may be viewed as "fair comment based on reasonable inferences from the evidence." *State v. Finley*, 273 Kan. 237, 247, 42 P.3d 723 (2002). So the real question is whether the prosecutor committed error by overstating to the jury that Williams' version was fabricated without explaining the evidentiary support for this claim. To answer this, we examine the comments at issue "in the context in which they were made, not in isolation." *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014).

A prosecutor may make statements about a defendant's trustworthiness "'to point out inconsistencies in a defendant's statements and to argue evidence that reflects poorly on a defendant's credibility.'" 300 Kan. at 560. But it is improper for a prosecutor to offer his or her personal opinion on a defendant's credibility. *State v. Pribble*, 304 Kan. 824, 835, 375 P.3d 966 (2016).

An example illustrating when a prosecutor's comments are within bounds is found in *State v. Baker*, 281 Kan. 997, 135 P.3d 1098 (2006). There, Baker complained the prosecutor improperly commented on his credibility by telling the jury his story—that the victim committed suicide by leaning his head into the gun, pulling the trigger, and killing himself—"'defies physics, it defies logic, and it certainly defies common sense.'" 281 Kan. at 1014. Baker viewed those statements as "akin to calling him a liar." 281 Kan. at 1014. The court disagreed, holding they were made to establish the defense theory's infeasibility and so no error occurred. 281 Kan. at 1015. It reasoned, when making those comments, the prosecutor pointed to "the weakness in Baker's story by reminding the jury of [the victim's] physical disabilities," which made the victim incapable of pulling the trigger by himself. 281 Kan. at 1014; see *State v. Moore*, 274 Kan. 639, 646, 55 P.3d 903 (2002); *Finley*, 273 Kan. at 246.

In Williams' case, the prosecutor's statements about Williams' trustworthiness were within proper bounds, although words like "fabricated" elevate the need for clarity in a prosecutor's remarks to tie the point being made to the evidence. In this case, the prosecutor started by emphasizing it was the jury's job "to determine the weight and credit to be given to the testimony of each witness," and reminding them of "two divergent, contrasting versions" of what happened that night. After saying—"I'm going to suggest to you that the defendant made a lot of his story up," which was basically arguing Williams' account was not believable, the prosecutor later discussed specific reasons why the trial evidence established the defense theory was infeasible.

First, the prosecutor argued "[t]he gun was fired seven times" and Tysha was shot twice, and considering the direction of those two shots, Tysha was not "able to shoot herself coming from behind in the manner in which the doctor testified." Second, the prosecutor maintained the aunt's reaction to the incident, as demonstrated by her voice in the 911-call recording, contradicted Williams' testimony that "after the shots were fired

9

he stood there, and that [the aunt] said you better leave now." Considering the statements at issue in their context, the prosecutor was advancing reasonable inferences based on the physical evidence, which supported his suggestion that Williams' testimony was unbelievable.

Finally, Williams questions whether the prosecutor's statement—"[Williams] formed the premeditation when he tried to drag her outside"—was error. But he raises this last issue in passing without providing any argument or citing authority, so we may disregard it. See *State v. Garza*, 290 Kan. 1021, 1034, 236 P.3d 501 (2010) ("Issues raised in passing that are not supported by argument or cited authority are deemed waived."). Even so, the remark merely restated the State's premeditation theory, which was supported by the evidence. See *State v. Douglas*, 274 Kan. 96, 106, 49 P.3d 446 (2002) (Douglas argued the prosecutor's closing statement—"'*Douglas was not aiding and abetting anyone*. [He] committed these murders by himself. And the evidence clearly establishes that'" was improper; the court held "the remarks were nothing more than a restatement of the State's theory that Douglas acted alone in the murders" so they were not improper. [Emphasis added.]).

We conclude there was no prosecutorial error.

THE *BATSON* CHALLENGE

During voir dire, Williams claims the State's peremptory strikes of two jurors, who were designated in the district court as Jurors 12 and 13, violated his constitutional rights under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The issues are whether the district court erred in finding the prosecutor had articulated race-neutral reasons and whether the court abused its discretion in concluding Williams had not established purposeful discrimination on the prosecutor's part. See *Hernandez v. New*

10

*York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) ("Once a prosecutor has offered a race-neutral explanation . . . and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); *State v. Dupree*, 304 Kan. 43, 58, 371 P.3d 862 (2016) (when parties did not challenge step one, court focused on the remaining steps). We hold there was no error.

*Additional facts*

As to Juror 12, the prosecutor offered three reasons to justify the strike. First, the prosecutor was unclear about Juror 12's gender. Second, he saw Juror 12 "nodding off several times" during voir dire. Third, she was a para-educator and the prosecutor was "not a fan of" that occupation. In response, defense counsel argued Juror 12's answer to the questionnaires made clear she was a female; counsel did not notice her "sleeping or anything of that nature"; and "there [were] other paras on the jury" but counsel did not specify who they were. The district court overruled the objection, finding the prosecutor's reasons were race neutral.

As for Juror 13, the prosecutor explained she was "19 years old [and had] no life experience, got her first job apparently out of school, been there for six months . . . [and] she's one on the jury not married." Defense counsel replied, "She didn't say a thing [during voir dire] and I don't think it's enough to strike her." The court denied Williams' *Batson* challenge by noting "striking for age is a race-neutral explanation."

*Standard of review*

*Batson* challenges involve a three-step process. *Dupree*, 304 Kan. at 57-58; *State v. Hill,* 290 Kan. 339, 358, 228 P.3d 1027 (2010); *State v. Pham,* 281 Kan. 1227, 1237,

11

136 P.3d 919 (2006). Under the first step, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. *Dupree*, 304 Kan. at 57; *Hill,* 290 Kan. at 358.

Second, if the prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This is a low burden because the justification need not necessarily be plausible or persuasive, even though it must be facially valid. *Dupree*, 304 Kan. at 59. The reason offered will be considered race neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. 304 Kan. at 57-58; *Hill*, 290 Kan. at 358.

In the third step, the district court determines whether the opponent has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations because usually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard. *Dupree*, 304 Kan. at 57-58; *Pham,* 281 Kan. at 1236-37. An appellate court gives "significant deference" to the district court's rulings. *Dupree*, 304 Kan. at 60; see also *Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) ("Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations.").

A district court abuses its discretion when it makes a decision based on an error of law or fact; or when it makes a decision that is otherwise arbitrary, fanciful, or unreasonable. *State v. Wilson*, 301 Kan. 403, 343 P.3d 102 (2015).

12

The parties do not contest step one but focus on the second and third steps.

*Analysis*

Under step two, once a defendant has established a prima facie case of the prosecutor's discriminatory intent, the burden shifts to the prosecution to come forward with a neutral, nondiscriminatory reason for exercising its challenges. *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005). The explanation must be "reasonably specific" but need not be based solely on the prospective juror's answers. *Purkett v. Elem*, 514 U.S. 765, 768-69, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995); *State v. Arteaga*, 257 Kan. 874, 883, 896 P.2d 1035 (1995) (quoting *State v. Hood*, 245 Kan. 367, 374, 780 P.2d 160 [1989], and discussing "[b]ody languages as a race-neutral reason").

When a prosecutor offers an explanation for striking a juror that does not relate to the characteristics of any particular race, the reason is race-neutral. *State v. Campbell*, 268 Kan. 529, 534, 997 P.2d 726 (2000). As to Juror 12, the prosecutor provided three reasons—her unclear gender, nodding off, and employment as a para-educator. As for Juror 13, the prosecutor explained she was young, unmarried, and had no life experience. All are race neutral. See *Elem*, 514 U.S. at 768-69 (holding the prosecution's proffered explanation that it struck a potential juror because he had "long, unkempt hair, a mustache, and a beard" was race neutral and satisfied its step two burden of articulating a nondiscriminatory reason for the strike; noting, for step two, the prosecution did not even need to provide a "minimally persuasive" explanation because "the persuasiveness of the justification becomes relevant" in step three); *Hernandez*, 500 U.S. at 360 ("A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.").

13

Under the third step, once the prosecution offers a neutral explanation, the defendant has the burden to show pretext, which "requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 252; *State v. Washington*, 275 Kan. 644, 653, 68 P.3d 134 (2003) ("burden of proving purposeful discrimination" is on defendant); see *Davis v. Ayala*, 576 U.S. __, 135 S. Ct. 2187, 2199, 192 L. Ed. 2d 323 (2015).

For Juror 12, the district court overruled the *Batson* challenge, by explaining:

"I would note that whether there was confusion about her [gender] or not, the Court would not find that particularly compelling one way or the other. I did not notice that she appeared to be sleeping. The explanation about [the prosecutor] not being fond of paras I'll leave each your own decision-making processes to ponder, but they are all race-neutral explanations and I will deny the Batson challenge on number 12."

As to the prosecutor's confusion about Juror 12's gender, the court's finding is vague. At most, as the State argues, it can be viewed as the court simply ignoring it. As for the second explanation, the court did not personally observe her sleeping but agreed it was race neutral. Williams claims the second explanation "was contradicted by the district court," but that is not so.

In *Thaler v. Haynes*, 559 U.S. 43, 47-48, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010), the Court rejected a habeas claim, concluding the prosecutor may be able to explain a strike because of a potential juror's demeanor, even when the district court judge did not personally observe and recall the demeanor on which the explanation was based. Accordingly, because the district court resolves a *Batson* challenge by heavily resting on the challenging party's credibility, whether the court noticed Juror 12's nodding off during voir dire does not mean the court abused its discretion. Cf. *United States v.*

14

*Thirdkill*, No 96-3471, 1997 WL 299408, at *1 (8th Cir. 1997) (unpublished opinion) (upholding a challenge when the prosecutor claimed a juror was "sleeping or nodding off during voir dire").

For the third reason, defense counsel responded by stating his wife was a para-educator, "so I understand [the prosecutor] may not like that." Counsel then broadly noted, "I understand there are other paras on the jury," but did not indicate who they were. Williams notes Juror 19 "worked at a school" like Juror 12, and Juror 41"worked with children" similar to Juror 12. Williams insists there was no "logical basis . . . for the State's distaste for para-educator," concluding that this must mean Juror 12 was struck because of her race. But these distinctions were not made during voir dire. Cf. *State v. Betts*, 272 Kan. 369, 396, 33 P.3d 575 (2001) ("The problem with the State's argument was that this distinction was not made at the time of the strike."), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). The record also shows Jurors 19 and 41 were not para-educators. The only other para-educator was Juror 47, who was not on the jury panel when the peremptory strikes were exercised.

"A factor to be considered in determining whether strikes are discriminatory is the presence of other members of the same minority on the jury and the failure of the State to remove such members when given the opportunity." *Betts*, 272 Kan. at 396-97. In Williams' trial, the jury had three African-Americans, and not only Juror 12 but also Juror 47 was struck, who had the same occupation as Juror 12. Williams' point is not well taken. See *Betts*, 272 Kan. at 396-97 (considering the fact that "the prosecutor . . . did not use his peremptory strikes to remove all African-Americans from the jury panel, although he could have done so" and upholding the district court's ruling the race-neutral reasons for the strikes at issue were valid).

15

Finally, as to Juror 13, the prosecutor's reasons were that she was young, unmarried, and had no life experience. As discussed above these were race neutral, so they are deemed as such unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. *Dupree*, 304 Kan. at 58. Williams' counsel's sole rebuttal was that the prosecution must have struck Juror 13 based only on her written questionnaire answers because the questioning was limited. But the questionnaires were used to avoid extended questioning, so limited questioning was a natural byproduct of this procedure.

Williams notes Juror 27 was not struck although she was in graduate school, implying she was young and had limited life experience like Juror 13. But this argument was not raised during voir dire. Furthermore, while it is correct Juror 27 was a graduate student, the record does not disclose, for example, whether Juror 27 was as young as Juror 13, whether she had any employment history, or whether she was married.

Under the circumstances, the district court did not abuse its discretion by concluding the prosecutor had a valid, race-neutral reason to strike each juror.

PHOTOGRAPHIC EVIDENCE

Williams claims the district court erred by admitting five autopsy photographs into evidence to aid with the direct examination of Erik Mitchell, the State's forensic pathologist, in explaining the injuries and cause of death. At oral arguments, Williams' counsel conceded this challenge focuses on three photos: Exhibits 28, 29, and 30. We discern no error as to any of the five photos.

16

*Additional facts*

Tysha was shot twice. The first three photographs relate to the first shot and two pictures concern the second shot. The photos and their use at trial can be summarized as follows:

- Exhibit 28 shows the injuries near Tysha's left eye, where a bullet entered, and the left margin of her mouth, where the bullet exited. It was taken before Mitchell "removed any evidence or altered the face in any way." It documents the injuries as he first saw them. Mitchell used Exhibit 28 to explain what he did and show the wounds' locations and nature.

- Exhibit 29 shows the "flight or pattern of the bullet" from near Tysha's left eye, down through her face, and entering her chest. The photo was taken after cleaning up the body "to specifically generate . . . an indicator of the path of this particular projectile" by placing "a metal rod through the internal course of the travel in the face and then down to the re-entry in the chest." Mitchell used Exhibit 29 to explain "the type of tearing that the [bullet] ha[d] caused, and . . . the irregular nature of the re-entry."

- Exhibit 30 shows the stippling around the initial entry wound near Tysha's eye. Mitchell used Exhibit 30 to explain the possible distance from which the shot was fired. According to his testimony, stippling was caused by small particles coming out from the gun barrel along with the bullet when fired. He testified that because stippling was "present but . . . not real dense," he believed the gun was not fired "right up close" but was "at least some inches away from the surface."

17

- Exhibit 31 shows the second bullet's entry wound on Tysha's back near her left armpit. Mitchell used Exhibit 31 in describing the second injury's location and nature.

- Exhibit 32 shows a close view of the gunshot's entry on Tysha' back. Mitchell used Exhibit 32 to show the stippling around the entry wound.

The district court found Exhibits 28 and 30 were "somewhat gruesome in nature" but concluded "if there is any prejudice in these photographs it's outweighed by the probative value that will be gained from the description of the wounds to the victim."

*Standard of review*

Appellate review of the admission of photographic evidence requires the court to determine first whether the challenged photos were relevant. If so, the decision to admit the photographs over a challenging party's objection that they are overly repetitious, gruesome, or inflammatory, i.e., unduly prejudicial, is reviewed for an abuse of discretion. The burden of showing an abuse of discretion rests with the party asserting the error. *State v. Tague*, 296 Kan. 993, 1002, 298 P.3d 273 (2013).

*Analysis*

Photographic evidence is relevant and generally admissible if it has a reasonable tendency to prove a material fact in the case. Autopsy photographs are sometimes gruesome, but they help a pathologist explain the cause of death, which makes them relevant and admissible. That said, admitting gruesome evidence simply to "'"inflame the minds of the members of the jury'" is error.'" 296 Kan. at 1002. Unduly repetitious

18

photographs' admission can constitute an abuse of discretion. "'The key, as with prejudice, is the word unduly.'" 296 Kan. at 1002. In a murder case, admission of photographs has rarely been held to be an abuse of discretion. 296 Kan. at 1002; see also *State v. Rodriguez*, 295 Kan. 1146, 1157-58, 289 P.3d 85 (2012) (observing autopsy photographs were "undeniably gruesome" but no abuse of discretion in admitting them, which is a rare holding in a murder case).

This particular crime was a violent and gruesome killing. "Gruesome crimes result in gruesome photographs." *State v. Green*, 274 Kan. 145, 148, 48 P.3d 1276 (2002) (holding photographs of murder victim's injuries were not unduly prejudicial although they caused juror to faint; noting gruesome offenses result in gruesome photos). The district court reviewed the State's photographs during a proffer to explain how Mitchell's intended use would help him explain the injuries inflicted and the cause of death.

Williams does not challenge the photos' relevance. He claims they were unduly gruesome because they "depicted grisly injuries suffered by Tysha when she was shot." And, he continues, the photos were unnecessary because the State had "far less inflammatory means to present [the] case." We reject these claims.

Admittedly, the photos were graphically illustrative of the murder and, of course, unpleasant to view. But the State did not offer them solely to inflame the jurors' passions or prejudices. See *Tague*, 296 Kan. at 1002. Mitchell used them to explain the fatal injuries' nature and extent, their location, and his opinion based on the stippling about the distance from which the two shots were fired. The photographs corroborated Mitchell's testimony and depicted the injuries in a way mere words could not. See *Dupree*, 304 Kan. at 65; *Hill*, 290 Kan. at 364.

19

Williams insists the photos were unnecessary because "the injuries were never contested." But as properly noted by the State, even when the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged, including the fact and manner of death and the violent nature of the crime. *State v. Backus*, 295 Kan. 1003, 1012, 287 P.3d 894 (2012).

The district court did not abuse its discretion. Its ruling was supported by the trial record and not guided by an erroneous legal conclusion. And this is not a case in which no reasonable person would have taken the view adopted by the trial court.

CUMULATIVE ERROR

There are no errors to accumulate based on our holdings.

Affirmed.