NOT DESIGNATED FOR PUBLICATION

No. 117,419

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TEVEERE BATES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed March 29, 2019. Affirmed in part and dismissed in part.

*Kristen B. Patty*, of Wichita, for appellant and *Teveere Bates*, appellant pro se.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., HILL, J., and WALKER, S.J.

PER CURIAM: Teveere Bates appeals following his convictions of second-degree murder and possession of methamphetamine with intent to distribute. Bates argues: (1) The district court erred in denying his motion to sever the charges; (2) the district court erred in overruling his objection under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to the State's use of peremptory challenges to strike two African-American members of the jury panel; (3) the district court erred in failing to instruct the jury on the lesser included offense of simple possession of methamphetamine; (4) the evidence was insufficient to support his second-degree murder conviction; (5) the

1

cumulative effect of the alleged errors violated his constitutional right to a fair trial; and (6) the district court failed to enter its restitution order in open court. Because we find no errors requiring reversal, Bates' convictions are affirmed, but his appeal on the sixth issue is now moot and will be dismissed.

FACTS

In the early morning hours of July 8, 2015, officers from the Wichita Police Department were dispatched to a shooting in the area of Douglas and Estelle Streets. Officers discovered the shooting victim, Richard Romero, lying in the street. Romero was taken to the hospital and later died from a gunshot wound.

Officers spoke to individuals at the scene and canvassed the area to search for possible witnesses to the crime. During the investigation, law enforcement identified Bates as a potential suspect in the shooting. Following a search of the area, officers located Bates in the attic of a nearby upstairs apartment. Also in the attic, officers discovered a black nylon bag with several smaller bags inside, including a Crown Royal bag that contained two pipes commonly used to smoke methamphetamine. Inside the black bag, officers found pills, a digital scale, a black phone cord, a gray digital recorder, and a plastic bag containing 13.88 grams of a white crystal substance that was later identified as methamphetamine. An audio file recovered from the recorder contained a recording of several voices, including those identified as belonging to Bates and Romero. The individuals in the recording engaged in conversation before the sound of a gunshot was heard. Officers searched the attic and the rest of the apartment but did not locate a gun.

The State charged Bates with one count each of second-degree murder and possession of methamphetamine with intent to distribute. At trial, multiple witnesses testified about the events leading up to Romero's shooting. On July 7, 2015, several

2

individuals had gathered at Richard Kennedy's apartment located at the corner of Douglas and Estelle to celebrate Kristi Dean's birthday. Bates, also known as "Top," lived in an apartment building north of Kennedy's apartment. Dean testified that she and Bates had prepared for her birthday party that afternoon and that she arrived at Kennedy's apartment between 9 and 10 p.m. Several people were already at the party, which took place outside on Kennedy's porch. Dean testified that Venitia Camel, known as "Baby Sister," and Isaac Riverson arrived at the party in a green Saturn SUV. Later, Bates arrived on foot and DeDawn Blake arrived in a black four-door sedan. Romero also joined the party at some point. According to Dean, Romero appeared only to know a man named Felix, another guest at the party.

At some point that evening, Bates and Blake left together in Blake's car. Blake testified that she drove Bates to a Kwik Shop to purchase cigarettes. Tyrell Boor, a Kwik Shop employee, testified that he was working when Bates came inside the store that night. According to Boor, Bates carried a black nylon bag that had a Crown Royal bag inside. Boor stated that Bates opened the Crown Royal bag to reveal crystal-like substances inside that he identified as methamphetamine and said that he had "gotten shorted on a deal" by around $500. Video from the Kwik Shop showed Bates entering the store with a black bag, opening the bag, and displaying its contents to Boor.

Back at Kennedy's apartment, Dean testified that she saw Camel leave the porch and walk to her car. Dean heard Romero ask if anyone had any weed. Dean then saw Riverson, Romero, and Felix leave the porch and walk through the yard. Dean denied witnessing any arguments or hostility between the men. Dean then observed Blake's black sedan drive around the corner onto Estelle but did not see who was inside. Thereafter, Dean heard a gunshot and saw Camel's car drive around the corner heading west on Douglas. Dean did not hear any sort of altercation before the gunshot. Dean stated that she and Kennedy waited a few minutes and then walked through the yard to the curb, where they saw Riverson running west in front of the laundromat. Dean claimed

3

that Riverson yelled, "Top's crazy" as he ran. Dean saw Romero lying in the street and Felix, who was knelt down next to him, said that Romero was not breathing. Dean did not see Bates in the area.

As Dean went back toward Kennedy's apartment she saw Bates running behind her. Once back at the apartment, Dean said she told Bates that a man was dying in the street and asked why he would do something like that. According to Dean, Bates said, "I had to do it, Baby Sister was in the car." Dean responded that Romero was just looking for some weed and was not trying to hurt anyone. Dean claimed that Bates said, "I didn't know, I didn't know." Bates then went to Kennedy's front porch, and Dean claimed to hear Bates tell Kennedy, "[D]on't say anything, don't tell." Dean said that after they heard the sound of sirens approaching, Bates jumped over to the porch next door and went upstairs to an apartment belonging to Tamra Silverson.

Dean spoke with law enforcement when they arrived and later went to the police station for an interview. Dean admitted that she did not see Bates or anyone else with a gun and did not witness the shooting. Dean also admitted that she drank wine and smoked marijuana at the party but denied that she was drunk or high. Finally, Dean admitted that she had told police at least three different versions of events but denied that she had been coerced or forced to make up her testimony.

Bates testified in his own defense. He stated that on the afternoon of the party, he ran errands with Dean and bought alcohol and marijuana for the party. Bates said that when he got to the party that night, he hung out on the porch, where he ate, drank, and smoked. Bates remembered Romero arriving at the party and said that he had previously met Romero. Bates testified that he left the party at some point, and Blake drove him to the Kwik Shop. Bates denied talking to Boor about a drug deal or showing him any drugs. Instead, Bates claimed that he showed Boor rings and other jewelry that he was selling.

4

Bates said that when he and Blake got back to the party, he saw Riverson and Romero talking and having some sort of altercation. Bates admitted that his voice was on the audio recording and stated that the recorder had been in a zippered pouch that he was wearing. Bates said that he set the pouch on top of Blake's car to go deal with the altercation between Riverson and Romero. When he asked them what was going on, Riverson said he was taking Romero to get some weed.

According to Bates, as Romero walked toward Camel's vehicle, Riverson said, "I'm glad you came because I almost shot that mother fucker." Bates claimed that he had seen Riverson with a little black handgun earlier in the evening. Bates stated that he tried to calm Riverson down, and Riverson then went with Romero to Camel's car to get some weed. Bates said he went back to Blake's car and talked to Blake before he noticed that Riverson and Romero were again having issues. Bates testified that Romero opened Camel's car door, which made Riverson mad. Bates said he went to diffuse the situation and ended up pushing Romero to the ground. Bates stated that he might have punched Romero but could not recall. Bates claimed that he was simply trying to get Romero to leave and come back later due to the tension with Riverson. Bates said that Riverson came up behind him, moved him out of the way, and shot Romero in the chest. But Bates admitted that he did not see Riverson with a weapon. Bates stated that he first ran to Blake's car but then ran to Kennedy's apartment, where he ran into Dean. Bates claimed that Dean was screaming and yelling about a man being dead, so he shook her and told her to calm down because he was worried that Riverson would come back and shoot them.

Bates testified that he was "shook up," so he went to Silverson's apartment, where he went up into the attic area that his friend Ruby was converting into a bedroom. Bates stated that Ruby gave him a hit of methamphetamine to help him calm down, but this was the only methamphetamine he saw in the attic and he did not know there was any additional methamphetamine in the black bag. Bates contended that the bag containing

5

the methamphetamine belonged to Ruby, and he believed that she had gotten the drugs from his cousin. Bates denied that the methamphetamine or the pipes in the bag belonged to him or that he was holding them for anyone else.

Bates disagreed that he was trying to hide from law enforcement, claiming instead that he stayed in the attic because he was "shook up" and did not want to see the police. Bates also said that Silverson had locked the attic door, causing him to be trapped. But Bates admitted that he had sold marijuana in the past and that he wanted to hide from law enforcement because the scales were his and he had marijuana on his person. Bates denied having any type of weapon and denied shooting Romero.

DeDawn Blake corroborated some parts of Bates' testimony. Blake testified that Bates told her about Riverson, stating that he was about to shoot Romero. Blake said that when Riverson and Romero went over to Camel's car, Bates got out of her car and went to talk to them. Blake claimed she saw Bates punch Romero, causing Romero to fall to the ground. Blake said that she observed Riverson standing over Romero and then heard a gunshot. But Blake said that Bates and Riverson both had their backs to her and she did not see a gun or see who shot Romero. Blake admitted that Bates was the only person she saw getting physical with Romero. Blake also testified that Bates came back to her car after the shooting and told her to drive him away and stated that he was not going down for something he did not do. Blake stated that she and Bates drove down the street a ways, but then she told Bates to get out of the car because she did not want any further involvement in the situation.

Riverson testified that he did not remember anything about the night of Romero's shooting and that he could not recall talking to the police or any prior testimony he may have given, including testimony that Bates had a gun and that he saw Bates shoot Romero. Riverson denied killing Romero.

The jury found Bates guilty as charged. The district court sentenced Bates to a controlling term of 653 months in prison. Bates timely appeals from his convictions and sentences.

ANALYSIS

As we have noted, Bates raises six areas where he contends the district court erred, resulting in the need for a new trial in the case. We will deal with each of his contentions in turn.

*Defendant's motion to sever the charges*

In his first issue on appeal, Bates contends that the district court erred in denying his motion to sever the charges against him.

An appellate court reviews potential joinder errors using a three-step analysis, applying a different standard of review at each step. First, the court determines whether K.S.A. 22-3202 permits joinder. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) establishes the three conditions permitting the joining of multiple crimes in a single complaint:  (1) The charges must be of the "same or similar character," (2) the charges are part of the "same act or transaction," or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether one of these conditions is satisfied is a fact-specific inquiry, and the appellate court will review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met will be reviewed de novo. *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017).

Second, because K.S.A. 22-3202(1) provides that charges "may" be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. An appellate court reviews this decision for an abuse of discretion. *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

Third and finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice, i.e., whether the error affected a party's substantial rights. K.S.A. 2017 Supp. 60-261; *Hurd*, 298 Kan. at 561.

In its original complaint, the State charged Bates with a single count of second-degree murder. The State later amended the complaint to include an additional count of possession of methamphetamine with intent to distribute. Before trial, Bates moved to sever the charges. Specifically, Bates claimed that the murder and drug charges were not of the same general character and that the consolidation of the charges would unfairly prejudice his defense. In response, the State alleged that the charges were sufficiently connected because the criminal conduct resulting in the drug charge was precipitated by the murder charge. Following argument from the parties, the district court denied Bates' motion to sever the charges. Specifically, the court found that the charges were connected because "the facts around them are intertwined." The district court further noted that the conduct resulting in the drug charges was precipitated by the murder investigation:

> "The facts that jump out to me are, first of all, the short time frame, we've got the 911 call reporting the shooting and subsequent—and death at 2:50 a.m., we have the home quarantined very quickly, about 3:00 a.m., have a search initiated very quickly, the police never leave the scene and at 5:15 a.m. it's reported that the defendant is found hiding in the attic with the meth. So the short time frame in between the drugs are found then at the time of the arrest and as a part of this investigation of the death of this individual."

8

Finally, the court found that joinder of the charges would not result in undue prejudice to the defendant.

Bates argues that the district court's ruling was in error, primarily because the murder and drug charges are not of the same or similar character. But the district court did not make such a finding. Thus, we need not review whether the crimes were of the same or similar character. In denying Bates' motion to sever, the court found that the crimes resulted from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." See K.S.A. 22-3202(1). Bates also contends that the charges were not sufficiently connected to warrant consolidation.

In determining whether the charges are connected together or constitute part of a common scheme or plan, Kansas courts have broadly construed the "connected together" language to apply in three situations: (1) when a defendant provides evidence of one crime while committing another, (2) where some of the charges are precipitated by other charges, or (3) when all the charges stem from a common event or goal. *State v. Donaldson*, 279 Kan. 694, 699-700, 112 P.3d 99 (2005). Courts also may join separate crimes that share "factual relationships." See *State v. Woods*, 250 Kan. 109, 117-18, 825 P.2d 514 (1992).

Here, the record reflects that Bates' drug charges resulted from the murder investigation. Law enforcement was dispatched to the scene of the shooting around 2:50 a.m. The police investigation led to Bates as a suspect, and officers ultimately located him in the attic of an apartment near the scene of the shooting sometime around 5:25 a.m. When they found Bates hiding, officers also discovered a black bag that contained pills, a digital scale, a recorder, a phone cord, a plastic bag containing methamphetamine, and a Crown Royal bag containing two pipes in the same location. Officers later learned that Bates possessed the same black bag earlier in the evening when

9

he went to the Kwik Shop before the shooting and showed the contents of the bag to the store clerk.

It is undisputed that law enforcement recovered the drugs Bates was charged with possessing while searching for him during the investigation of Romero's death. They would not have discovered the drugs under these circumstances were it not for the murder investigation. Thus, the murder investigation precipitated the conduct resulting in the drug charge. See *State v. Anthony*, 257 Kan. 1003, 1016-17, 898 P.2d 1109 (1995) (charges for criminal possession of firearm and sale of cocaine properly connected to charges for murder and robbery where firearm discovered during search seeking evidence of murder and robbery); *State v. Moore*, 226 Kan. 747, 749-50, 602 P.2d 1359 (1979) (two cases sufficiently connected together under K.S.A. 22-3202 because first case precipitated conduct in second case).

We find there to be substantial competent evidence to support the district court's factual findings that the conduct underlying the drug charge was precipitated by the conduct relating to the murder charge. These findings were sufficient to support the court's legal conclusion that Bates' crimes were "connected together," making joinder permissible under K.S.A. 22-3202(1).

Next, we must review whether the district court's decision to permit joinder under K.S.A. 22-3202(1) was an abuse of discretion. See *Hurd*, 298 Kan. at 561. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court, (2) it is based on an error of law, or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). The burden is on Bates to establish the abuse of discretion. See *State v. Gaither*, 283 Kan. 671, 688, 156 P.3d 602 (2007); *State v. Bunyard*, 281 Kan. 392, 403, 133 P.3d 14 (2006).

Bates' arguments do not focus clearly on this step. The only portion of Bates' supplemental brief that could be construed as addressing abuse of discretion is his argument that consolidation of the charges led to prejudicial admission of other crimes evidence under K.S.A. 2017 Supp. 60-455. Bates contends that the jury could have presumed that a person who possessed and sold methamphetamine was more likely to shoot someone. But "'Kansas case law and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455.'" *State v. Smith Parker*, 301 Kan. 132, 161, 340 P.3d 485 (2014).

Moreover, Kansas courts have rejected arguments that jurors use evidence of one crime to prove the other when jurors have been instructed to consider each charge separately on the evidence and law applicable to it. *State v. Cruz*, 297 Kan. 1048, 1058, 307 P.3d 199 (2013). The district court here provided the jurors with such an instruction. "Appellate courts have ascribed to the hypothetical presumption that such an instruction negates the inherently prejudicial effect of trying a person on multiple counts." 297 Kan. at 1058; *Gaither*, 283 Kan. at 687. In short, Bates has not met his burden of establishing that the district court abused its discretion in denying his motion to sever.

Because joinder was permissible under K.S.A. 22-3202(1) and the district court did not abuse its discretion in so ruling, we hold that the district court did not err in denying Bates' motion to sever. As a result, we need not address the third step under *Hurd*, i.e., whether any error in consolidation affected Bates' substantial rights. See 298 Kan. at 561.

Batson *challenge*

As his second issue on appeal, Bates, an African-American, contends the district court erred in overruling his *Batson* objection to the State's use of peremptory challenges

11

during voir dire to strike R.T. and G.C., potential jurors who were also African-American.

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution 'applies to the State's privilege to strike prospective jurors through peremptory challenges.'" *State v. Dupree*, 304 Kan. 43, 57, 371 P.3d 862 (2016). In *Batson*, the United States Supreme Court held that the Equal Protection Clause prohibits prosecutors from exercising a peremptory challenge against a potential juror solely because of the juror's race. 476 U.S. at 89.

Under *Batson*, an objection to the State's use of a peremptory challenge during jury selection is analyzed in three distinct steps, with different standards of review for each step. *Dupree*, 304 Kan. at 57.

"'First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step.

"'Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion.

"'Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations. "[U]sually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard." [Citations omitted.]'" *Dupree*, 304 Kan. at 57-58.

12

A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court, (2) it is based on an error of law, or (3) it is based on an error of fact. *Marshall*, 303 Kan. at 445.

During voir dire, the prosecutor asked whether the potential jurors had any personal experience with the criminal justice system. G.C. responded that his older brother had been convicted of cocaine distribution in the late 1970s and had served 11 years in prison. The prosecutor later asked whether any of the potential jurors knew anyone in law enforcement. G.C. responded that he had a high school friend who was a Wichita police officer. G.C. stated that this friend had gotten into some trouble and that he had not spoken to him for at least a year.

Also during voir dire, R.T. told the prosecutor that she had graduated from college with a double major in business and theater and liked to do musical theater in her spare time. R.T. said that she was working two jobs to save money because she wanted to move to New York.

At the conclusion of voir dire, the prosecutor used one of the State's peremptory challenges to strike R.T. from the jury. After the prosecutor expressed his intention to use another peremptory challenge to strike G.C. from the jury, defense counsel objected pursuant to *Batson*. Defense counsel noted that G.C. was the last remaining African-American potential juror, as the State previously had peremptorily challenged R.T. and the defense previously had peremptorily challenged D.P., the only other African-Americans on the jury panel. The district court found Bates had made a prima facie showing that the State had exercised a peremptory challenge on the basis of race and asked the prosecutor to articulate race-neutral explanations for striking both R.T. and G.C. The prosecutor stated,

13

"With regards to [R.T.], the answers are two-fold. One. The State, in seeking jurors, seek people with life experience. If the Court were to note that five of the State's first six strikes were all people who were young, who were uneducated, for the most part, or still going to college, or had very little life experience outside of that.

. . . .

"[R.T.], what struck the State about [her] is she said she had a dual major, but yet is working two part time jobs. She occupies her time with theater, trying to save money. She has very little life experience. Again, she's 23 years old. She is very young. And while she is educated, the other issue is I find it odd that someone who has two degrees has to work two part time jobs. One in sales, and one is basically a receptionist, to raise money, to save money to go to New York to do what she really wants to do.

"And so for those reasons, Judge, we struck [R.T.]. It had nothing to do with race. It has to do with life experience. And it has to do with experience beyond her jobs. And I had some concern about her education level, even though she has degrees. I have concerns when somebody has to work two part time jobs to save money."

As for G.C., the prosecutor noted that the State also had struck another potential juror whose daughter had a drug conviction and served time in a correctional facility. The prosecutor continued,

"The State does not prefer people who have close relations to those who have felony drug convictions.

"[G.C.] had a brother who had—I believe it was a cocaine distribution—felony cocaine distribution. And although it was in the 70's and he was treated fairly . . . again, it's not something that we prefer.

"Second of all, he had an individual friend . . . who I believe is currently being held in Colorado. It's a media case. The Court may recall it received some media attention. He was the law enforcement officer I believe that is accused—I believe accused at this point still of molesting children at school.

. . . .

"And so I have a law enforcement officer now, a second person with [G.C.], who has been associated with criminal conduct. . . . [E]ven though he believed his brother was

14

treated fairly, the State does not prefer people on their jury who associate with those that have criminal backgrounds. And this would be the second person for [G.C.]."

The district court found that the explanations offered by the prosecutor were race-neutral and overruled Bates' *Batson* challenge.

Both parties acknowledge that Bates made a prima facie showing that the State exercised peremptory challenges on the basis of race. Bates claims that the district court (1) erred by finding the State articulated race-neutral reasons for striking R.T. from the jury and (2) abused its discretion in concluding that Bates did not establish purposeful discrimination with respect to G.C. Bates argues that the State's peremptory strikes of R.T. and G.C. constituted an unlawful pattern of strikes against prospective African-American jurors.

As noted above, under the second step of the *Batson* test, the burden shifts to the State to articulate a race-neutral reason for striking the prospective juror. When a prosecutor offers an explanation for striking a juror that does not relate to the characteristics of any particular race, the reason is race-neutral. *State v. Campbell*, 268 Kan. 529, 534, 997 P.2d 726 (2000). In this regard, "[t]he State carries a relatively low burden to provide a race-neutral reason for a strike—the justification must be facially valid, but it need not necessarily be plausible or persuasive." *Dupree*, 304 Kan. at 59.

Bates contends that the State's reasons for striking R.T. were not sufficiently race-neutral to support a peremptory strike. As we noted, the State offered several reasons for striking R.T. from the jury—her youth, her lack of life experience, her education level, and the fact that she was working two jobs to save money. The State also struck other prospective jurors who were not African-American for similar reasons. Although it is possible to quibble about the validity of the State's rationale, it is undeniable that the State proffered plausible and facially valid, race-neutral reasons for peremptorily

15

challenging R.T. See *State v. Williams*, 308 Kan. 1320, 1331-32, 429 P.3d 201 (2018) (State's reasons for striking potential juror because she was young, unmarried, and had no life experience were race neutral). Thus the State has successfully complied with the second prong of the *Batson* criteria in justifying its challenge to R.T.

In the final step of the *Batson* analysis, the district court must determine whether the defendant has carried the burden of proving purposeful discrimination. We review this determination for abuse of discretion. *Dupree*, 304 Kan. at 58. Bates claims that he did establish purposeful discrimination with respect to G.C. because the State's claim that G.C. had a close association with individuals who had criminal backgrounds was contrary to the record.

As detailed earlier, however, G.C.'s statements about his brother's felony conviction and imprisonment and his friendship with a law enforcement officer who was accused of molesting children provide a factual basis to support the prosecutor's concerns that G.C. had both a family member and a friend with criminal backgrounds. The State also struck another prospective juror who was not African-American because she had a daughter with a prior conviction, so the strike of G.C. was clearly consistent with the State's method of jury selection.

The State's reasons for striking R.T. and G.C. were clearly race-neutral, so they are deemed as such unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. *Dupree*, 304 Kan. at 58. We find no such discriminatory intent to be present here. Under these circumstances, the district court did not abuse its discretion by concluding that the prosecutor had valid, race-neutral reasons to strike R.T. and G.C. As a result, the court did not err in overruling Bates' *Batson* challenge.

16

*Simple possession of methamphetamine as a lesser included offense*

For his third issue, Bates argues that the district court erred by failing to instruct the jury on simple possession of methamphetamine as a lesser included offense of possession of methamphetamine with intent to distribute.

We employ a four-step process when reviewing a district court's failure to give a lesser included instruction:

> "(1) [F]irst, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the trial court erred, the appellate court must determine whether the error was harmless." *State v. Soto*, 301 Kan. 969, Syl. ¶ 9, 349 P.3d 1256 (2015).

A district court errs in failing to instruct the jury on lesser included offenses when there is some evidence that would reasonably justify a conviction of the lesser included offense. K.S.A. 2017 Supp. 22-3414(3); *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014). An offense is a lesser included offense if the elements of the lesser crime are identical to some of the elements of the crime charged or if the offense is a lesser degree of the same crime. K.S.A. 2017 Supp. 21-5109(b); see *State v. Simmons*, 295 Kan. 171, 176, 283 P.3d 212 (2012). The duty to instruct is triggered by the defendant's request for such instruction and applies even if the evidence is weak, inconclusive, and consists solely of the defendant's testimony. *State v. Maestas*, 298 Kan. 765, Syl. ¶ 6, 316 P.3d 724 (2014).

17

The record reflects that Bates requested a simple possession instruction, thus preserving this issue for appellate review. This instruction would have been legally appropriate because simple possession is a lesser included offense of the crime of possession with intent to distribute. See *State v. Gilmore*, No. 97,362, 2008 WL 5234530, at *2 (Kan. App. 2008) (unpublished opinion); see also K.S.A. 2017 Supp. 21-5705(a)(1), (d)(3)(C) (defining severity level 2 possession of methamphetamine as "distribut[ing] or possess[ing] with the intent to distribute" methamphetamine if quantity possessed was at least 3.5 grams but less than 100 grams); K.S.A. 2017 Supp. 21-5706(a) (defining simple possession as possessing methamphetamine).

But for a lesser included instruction to be factually appropriate, "there must be actual evidence in the record, together with reasonable inferences to be drawn from that actual evidence that would reasonably support a conviction for the lesser crime." *State v. Wade*, 295 Kan. 916, 926, 287 P.3d 237 (2012). Bates claims that a simple possession instruction was factually appropriate based on his testimony at trial. According to Bates, he testified that the only methamphetamine he had possessed was some methamphetamine while he was in the attic, but he was unaware of any additional methamphetamine other than the amount that he actually possessed and used.

Bates mischaracterizes his testimony. While on the witness stand Bates did not admit to possessing methamphetamine. Instead, he admitted that he "took a hit of some meth" after Ruby offered it to help him calm down. Bates claimed that he was only aware of this methamphetamine that he used. He denied knowledge of the methamphetamine in the bag in the attic, expressing a belief that it must have belonged to Ruby.

Bates admitted, however, that the video from the Kwik Shop showed that he took that same bag inside the store. Bates also denied that the bag belonged to him but agreed that he must have taken it into the attic later. The Kwik Shop employee testified that Bates had showed him methamphetamine inside the black bag and told him that he had

18

been shorted $500 on a drug deal. When law enforcement located Bates in the attic, they also discovered the black bag. The bag contained a Crown Royal bag, two methamphetamine pipes, a digital scale, pills, a phone cord, a recorder, and 13.88 grams of methamphetamine.

Bates was not found in possession of the methamphetamine that he allegedly smoked or any smaller amount of methamphetamine. Thus, there was no evidence presented from which the jury could reasonably infer that Bates possessed some lesser amount of methamphetamine than that discovered in the black bag. Because a lesser included offense instruction on simple possession was not factually appropriate, the district court did not err in failing to instruct on the lesser included crime of simple possession of methamphetamine.

*Sufficiency of the evidence on second-degree murder*

In his fourth contention on appeal, Bates argues that the State failed to present sufficient evidence to convict him of second-degree murder. Our standard of review requires us to review the evidence in a light most favorable to the prosecution:

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

Second-degree murder, as relevant here, is defined as "the killing of a human being committed:  (1) intentionally." K.S.A. 2017 Supp. 21-5403(a). "A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to

19

engage in the conduct or cause the result." K.S.A. 2017 Supp. 21-5202(h). The district court instructed the jury accordingly.

In challenging the sufficiency of the State's evidence, Bates notes that there was no physical evidence or eyewitness testimony implicating him as the shooter. Bates claims that the evidence presented by the State showed only that he was present and in close proximity to Romero at the time of the shooting. He alleges that this evidence is speculative and fails to provide proof of his guilt beyond a reasonable doubt. As additional support for his argument, Bates cites to evidence in the record implicating Riverson as the shooter.

But a review of the record in the light most favorable to the State reveals sufficient evidence upon which a jury could have found beyond a reasonable doubt that Bates intentionally killed Romero. In addition to the evidence detailing Bates' presence at the scene of the crime, the jury heard evidence that shortly before the shooting, Bates was involved in an altercation with Romero and either pushed or punched him. Dean testified that after she heard a gunshot, she saw Riverson running west and heard him yell, "Top's crazy." Dean encountered Bates when she went back to Kennedy's house and their conversation about the shooting included statements from Bates that he "had to do it" because "Baby Sister was in the car." When Dean told him that Romero was just looking for weed, Bates said, "I didn't know, I didn't know." Dean also testified that she heard Bates tell Kennedy, "[D]on't say anything. Don't tell." After the shooting, law enforcement discovered Bates in a nearby attic.

As earlier stated, when reviewing the sufficiency of the evidence, we do not reweigh the evidence and must review the record in the light most favorable to the State. *Chandler*, 307 Kan. at 668. Moreover, as our Supreme Court has found, "'even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the

20

inference.'" *State v. Rosa*, 304 Kan. 429, 433, 371 P.3d 915 (2016); *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). It is unnecessary to exclude every other reasonable conclusion or inference that might be reached from other evidence presented at trial. *State v. Scaife*, 286 Kan. 614, 618, 186 P.3d 755 (2008). Viewing the evidence in the light most favorable to the State, we believe there was sufficient circumstantial evidence presented at trial upon which a reasonable fact-finder could conclude that Bates committed the crime of intentional second-degree murder.

*Cumulative error*

In his fifth contention, Bates argues that the cumulative effect of the errors alleged above deprived him of his constitutional right to a fair trial. When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. *State v. King*, 297 Kan. 955, 986, 305 P.3d 641 (2013). In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. *State v. Sean*, 306 Kan. 963, 993, 399 P.3d 168 (2017).

But because Bates has not established that any errors occurred in district court, we reject his cumulative error argument on grounds that there are no errors to accumulate. See *State v. Johnson*, 304 Kan. 924, 956, 376 P.3d 70 (2016).

*Failure to establish restitution in open court*

Finally, Bates argues that the district court's sentencing journal entry of judgment is erroneous, and he requests that we remand the case with directions that the district court issue a nunc pro tunc order to correct the journal entry.

As Bates was leaving the courtroom at the end of his sentencing hearing, the prosecutor reminded the district court to enter orders regarding restitution and witness fees. After Bates exited the courtroom, the court ordered Bates to pay witness fees in the amount of $80 and restitution to the Crime Victim's Compensation Board in the amount of $5,673.20. The prosecutor noted that the court should also enter an order for a $400 lab fee. The judge responded, "Well, he's gone. I'm not going to bring him back—he's never—I'm not going to order it." However, the sentencing journal entry of judgment approved by the court reflected total restitution in the amount of $5,673.20 and witness fees in the amount of $80.

Bates argues that the part of the journal entry ordering him to pay restitution is in error because the district court did not enter the order before he left the courtroom and did not bring him back into the courtroom for purposes of entering a restitution order. While this appeal was pending, however, the district court issued an order nunc pro tunc correcting the journal entry to reflect the removal of both the witness fees and restitution amount. Therefore, this issue is now moot and must be dismissed. See *State v. Johnson*, 39 Kan. App. 2d 438, 442-43, 180 P.3d 1084 (2008).

Affirmed in part and dismissed in part.